No. 2522.

Wesley Alexander v. The State.

1. Murder—Self Defense—Threats—Charge of the Court—It is a settled rule of practice in this State that if a person accused of culpable homicide has been threatened by the deceased with death or serious bodily injury, and such threat has, prior to the homicide, been communicated to the defendant, and at the time of the homicide the deceased by any act manifested an intention to execute such threat, the defendant would be authorized to act upon appearances in resorting to any means to protect himself, and a killing under such circumstances would be justifiable homicide. In view of the proof in this case, the failure of the trial court to give this rule in charge to the jury was error.

2. Same—"Adequate Cause."—The trial court erred in this case in failing to affirmatively charge the jury as to the threats and as to the character of the deceased, and his conduct at the time of the homicide, in order that the jury might have considered the same in determining whether or not "adequate cause" for the homicide existed.

3. Same.—The trial court having charged the jury as to the law in case the evidence showed that the defendant provoked the contest with the deceased with the intent to kill him, it should have gone further, in view of the proof, and instructed them as to the law in case he provoked the contest with no intent to kill, and the omission to do so was error.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. Gustav Cook.

The conviction in this case was in the second degree, for the murder of Si Watson, and the penalty assessed was a term of ten years in the penitentiary.

Dick Sessums was the first witness for the State. He testified

that one night, about two weeks before the homicide, he went to the defendant's gaming room, which was situated in the city of Houston. At about nine o'clock, while witness and defendant were alone in the room, they heard a noise outside which sounded like some person slipping about the closed door. Defendant remarked to witness. "That is Si Watson moving about here. He has had me and other men indicted for running gaming houses, and I intend to kill him if he comes into my house again." The witness was not a confidant of the defendant, and could not conjecture the defendant's motive or purpose in making that statement to him.

Robert Spann, colored, was the next witness for the State. He testified that he witnessed the shooting of the deceased by the defendant from the slatted window of the house immediately next to the defendant's gaming room. The killing occurred on the night of October 21, 1887. The witness, from his slatted window, commanded a perfect view of the interior of the defendant's gaming room, and was in a direct line of vision with defendant and deceased, though he could not see the lower half of their bodies. He was not more than ten feet distant from defendant and deceased. Loud talking in the gaming room first attracted witness's attention. He then observed defendant and deceased on opposite sides of a table, and some six or seven people standing around. Deceased had no stick nor other weapon in his hand that witness saw. Defendant was about ten or twelve feet distant from deceased when he fired the first shot, which he fired from behind the table. He then moved around the table and fired two more shots, reaching a point within about eight feet of deceased. Just after the third shot, deceased said: "Damn you, shoot me here." Defendant fired again; deceased staggered, took a seat on a bench, leaned his arms on the table and his head on his arms. The witness went at once to the gaming room and found the deceased dead.

Cross examined, the witness said that but one of the four shots took effect, and that entered deceased's body at the left breast. Witness had been drinking some on that night, but was not drunk. In reply to questions, witness denied that he had unfriendly feelings towards defendant. He then admitted that he and defendant were partners some time before the shooting, and had a falling out. He denied that he had been to Mr. Fisher's office since the homicide. He denied that he ever told Mr. Fisher that he was too drunk at the time of the killing to know

what transpired. He denied that he was drunk when the inquest was held, on the night of but after the killing. He did not hear what was said by either deceased or defendant just before the shooting. He only heard loud talking, which he could not understand. Witness was in the range of balls fired at the table, but did not take his face from the window. The witness knew Harrison Brown, and knew that defendant had often expelled said Brown from his place of business.

Mr. Jones, sheriff of Gonzales county, testified for the State, that he and his deputy, Mr. Churchwell, were in Houston on the night of the homicide. While at the Tremont House on that night, he heard loud talking at a place diagonally across the street. That loud talking was speedily followed by three or four shots. Witness ran to the place of the shooting, followed by his deputy. When witness reached the house he went in and found deceased sitting by a table with his head resting on it. Defendant was standing about six feet off, with his pistol covering deceased. Just as witness stepped in defendant said: "The d—d son of a bitch spied for George Ellis, and then came in here with a stick and raised a row with me and I killed him." Witness then arrested defendant and turned him over to a policeman who, with Churchwell, entered the room soon after he did. Witness covered defendant with his pistol as he stepped into the room. No other persons than defendant and deceased were in the room when witness entered it. If there was a stick in the room when witness entered, he did not see it. He did not think he would have overlooked a stick, but would not swear that there was no stick in there. Neither Wenzel nor Harrison were in the room when witness entered it. Witness could not say who, if any body, was in the room immediately in the rear of defendant's gaming room. Witness was dressed in civilian's clothes, and had no badge on when he went into the room. The policeman who followed witness into the room took the defendant into custody, and took possession of his pistol. Witness examined defendant's pistol and found every chamber empty. Defendant made no effort to escape.

Wallace Harris, colored, testified, for the State, that he was in defendant's gambling saloon, and witnessed the killing of the deceased by the defendant. Witness and others were betting at a game dealt by the defendant a short while before the shooting occurred. A colored man staked some money concealed in a small cloth bag. Defendant told the man that he would not pay

money bet in a bag, and that a bet with the money exposed would alone be recognized. About that time the deceased came up and said to the man: "You won the bet, and ought to have your money." Defendant then said to deceased: "Si, I have told you often enough to stay out of my house. Now leave, and don't come in my house again." Deceased replied: "When I go out I will see that you go out too." He then left the room. In a few minutes the deceased, with a stick in his hand (the one in evidence), came back and stood behind the witness, who was sitting in a chair facing defendant, on the opposite side of the table. Deceased held his hands and his stick behind him. Witness was unable to say that defendant could or could not see the stick as deceased held it. Defendant suddenly started up from his chair and fired, and deceased struck at defendant with the stick, from behind witness and over witness's shoulder. Defendant then moved around the table towards deceased and fired two more shots. Deceased, making a motion to expose his breast, said: "D—n you, shoot me here." Defendant fired, and deceased staggered, and fell with his head resting on the table. Deceased was making no demonstrations at defendant when the latter fired the first shot, and did not strike at defendant with his stick until after the first shot was fired. He did not hit defendant with the stick. Witness paid no particular attention to what occurred just before defendant fired the first shot, as, knowing that the "thing" was going to "get interesting," he occupied himself in getting his chips cashed.

Cross examined, the witness admitted that he did not know the meaning of "hostile demonstrations." Deceased was standing immediately behind witness just before the shooting began, and witness was then busy getting his chips cashed. It was not true that deceased entered the room and walked directly up to the defendant and struck him over the head with the stick. He stopped immediately behind witness, and at least ten feet distant from defendant, and held his stick in his hands behind him. Witness did not hear deceased say, when defendant ordered him out of the house, that he would go out and get something to fix the defendant with.

The State rested.

Harrison was the first witness for the defense. He testified that he was present at the time of the shooting, and had then been in the gaming room some time. A man made a bet by placing a small bag containing something—money, probably—on

a card. Defendant, who was sitting at the table dealing the game, told the man that he must bet his money in sight, and that he would not pay a bet made with the stakes in a bag. The man then turned to deceased, who arrived about that time, and asked him: "Si, how is this? I bet with my money in a bag, and the dealer refuses to pay." Deceased replied: "Don't tell me anything about the d—d son of a bitch." Defendant quietly but firmly said to deceased: "Si, I have told you several times to stay out of my house. Now, when you go out, stay out." Deceased replied: "When I go out, you will go out too. I will fix you." Deceased then went out, but within a few minutes came in at the door with the stick in evidence in his hand, rushed upon defendant, and, wielding the stick with both hands, struck him over the head, exclaiming: "You will put me out, will you, you son of a bitch!" Defendant raised himself from his chair and fired at deceased as rapidly as he could. Defendant made no demonstration towards deceased until the latter struck him with the stick. Deceased was a very large, powerful man, and bore the reputation of an overbearing man, and as one who would probably execute a threat. Witness and Wenzel, and, as witness thought, others, were in the room when Sheriff Jones came in.

Frank Wenzel testified, for the defense, substantially as did the witness Harrison. He stated that deceased was on his way out of the room when, referring to defendant, he said: "I'll fix you." Defendant commenced to get up from his seat when deceased rushed into the room with the stick, and was in the act of rising when deceased struck him over the head with the stick. He did not draw, nor attempt to draw, his pistol until after deceased struck him. Most of the people in the house rushed out as the deceased rushed in with his stick. Witness was in a dark corner of the room when Sheriff Jones came in.

Mr. Harville (white) testified, for the defense, that he knew the deceased well, but had no acquaintance with the defendant, though he knew him by sight, and knew where he kept his gambling room. Witness, on his way home on the night of the tragedy, saw deceased standing on the sidewalk in front of defendant's gaming room. He had a stick in his hand, and witness casually asked him what he was going to do with it. Deceased replied: "I am going in here and raise hell with that son of a bitch." Witness did not know who he referred to. The shots were fired by the time that witness had walked half a

---

---

block.   Deceased was a very powerful man, and bore the reputation of being a very overbearing man.

Harrison Brown (colored) testified, for the defense, that on the fourth day before the tragedy he met the deceased on the street opposite defendant's gaming house, and asked him for a dime. Deceased said that he did not have a dime.   Witness remarked that he would go over and get one from defendant.   Deceased said:  " That d—d son of a bitch won't give you one."   Witness asked him why he applied that epithet to the defendant, and what he had against defendant.   Deceased replied that defendant got the best of him in a transaction involving some tables, and that he intended to pick at the d—d son of a bitch until he got a chance to kill him.   On that same day witness told defendant about the threats of deceased, and advised him to be on his guard, adding:  " You know what kind of a man he (deceased) is."   The reputation of deceased was that of an overbearing, determined man, who would, in all probability, execute any threat he made.

Six or seven witnesses called by the defense testified that the reputation of deceased was that of an overbearing, dangerous man, calculated to execute a threat, and that defendant had always maintained the reputation of a quiet, law abiding citizen.

Two witnesses called by the State, in rebuttal, testified that the reputation of the deceased was that of a peaceable, law abiding citizen.

Robert Spann, recalled by the State, testified that the State's witness Wenzel was at one time in the defendant's employ as dealer. ·

Sheriff Jones was recalled by the State, and testified that neither Wenzel nor Harrison, nor any other person, was in the gambling room when he entered.

The motion for new trial raised the questions discussed in the opinion.

*H. F. Fisher, T. E. Conn* and *Jones & Garnett,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   It was shown by the testimony of the defendant that, a few days prior to the homicide, deceased had threatened to kill him, and that such threat had been communi-

cated to him. It was also shown that the general reputation of the deceased was that of an overbearing, dangerous man, who would be likely to execute such a threat. It was further shown that, before the defendant shot or attempted to shoot the deceased, or inflict upon him any other violence, he was stricken, or stricken at, by the deceased, who was a powerful, athletic man, with a stick, and that the defendant began shooting at the deceased while the deceased was continuing the assault upon him with the stick.

Such being the evidence in behalf of the defendant, it was the imperative duty of the court to instruct the jury in the law applicable to such evidence; that is, in relation to such threat and the character of the deceased. It is well settled that if a person accused of culpable homicide has been threatened by the deceased with death or serious bodily injury, and such threat has, prior to the homicide, been communicated to the defendant, and at the time of the homicide the deceased by any act manifested an intention to execute such threat, the defendant would be authorized to act upon appearances, in resorting to any means to protect himself, and a killing under such circumstances would be justifiable homicide. Under the facts of this case this rule of the law should have been given to the jury as a part of the law of self defense.

We are further of opinion that the evidence as to threats, character of deceased, and the conduct of the deceased at the time of the homicide, should have been affirmatively submitted to the jury to be considered by them in determining whether or not "adequate cause" for the homicide existed. (Sims v. The State, 9 Texas Ct. App., 586; Williams v. The State, 22 Texas Ct. App., 497.) Defendant, at the time of the trial, promptly excepted to the charge of the court, because it omitted to instruct the jury as above indicated. There is no instruction whatever in the charge given to the jury, in relation to the threats shown to have been made by the deceased, etc. This phase of the case, presented by the evidence, is not embraced in any manner in the charge.

There is also error, we think, in that portion of the charge which relates to the rules of the law applicable where the contest in which the homicide takes place is provoked by the defendant. It is not clear to our minds that the evidence authorized a charge upon this subject, but, conceding that it did, the whole law relating thereto should have been explained. The

jury were instructed what the law was in case the evidence showed that the defendant provoked the contest with the deceased with the intent to kill him, but were not instructed as to what the law is when a difficulty is provoked with no intention to kill. As given, we think this portion of the charge was erroneous, and calculated to prejudice the rights of the defendant. (White v. The State, 23 Texas Ct. App., 154; Green v. The State, 12 Texas Ct. App., 445.)

Other objections are urged to the charge which we deem it unnecessary to discuss or determine, as they will doubtless be eliminated on another trial in supplying the defects already noted, and because of which defects the judgment is reversed and the cause is remanded.

*Reversed and remanded.*