## S. C. WILSON v. THE STATE.

### No. 2423. Decided May 7, 1913.

**1.—Murder—Evidence—Declaration of Defendant.**

Where, upon trial of murder and a conviction of manslaughter, it was a sharply contested issue whether or not defendant was mistaken in shooting the deceased for his brother, and the State claimed that there was no mistaken identity as to this and attempted to impeach the defendant as to this matter, the defendant should have been permitted to introduce his declarations in evidence in support of his contention that he believed he shot deceased's brother when he was first told that he shot the deceased and then declared that he thought it was his brother who had threatened to kill him.

**2.—Same—Rule Stated—Explanations—Conduct of Defendant.**

When a person is first charged with any crime, his acts, words, and conduct are admissible in evidence, either when they are incriminating in behalf of the State, or when they are explanatory, in his own behalf.

**3.—Same—Evidence—Self-serving Declarations.**

Where defendant contended that he shot the deceased by mistake thinking that it was his brother, he could not introduce in evidence his declarations as to this matter after he had been informed that he killed the deceased and not his brother, as this was self-serving testimony.

**4.—Same—Evidence—General Reputation.**

Where defendant claimed that he thought at the time of killing deceased that it was his brother who had threatened defendant, there was no error in permitting the State to introduce testimony that said brother was a peaceable, law-abiding citizen.

**5.—Same—General Reputation—Evidence.**

Where there was evidence that the defendant killed deceased believing that it was the brother of deceased who had made threats against the life of defendant, it was error to permit the State to prove the general reputation of the deceased as a peaceable, law-abiding citizen, as his reputation was not attacked by the defendant.

**6.—Same—Charge of Court—Provocation.**

Where defendant killed deceased contending that he acted under mistake in thinking that he was shooting his brother who had threatened defendant's life and insulted his daughter it was error in the court's charge to instruct the jury that a provocation given by some other persons than the party killed was not adequate cause in manslaughter.

**7.—Same—Self-defense—Charge of Court—Mistake.**

Where defendant claimed a mistake in killing deceased and that he intended to shoot the brother of deceased in self-defense, the court should have informed the jury that if this was true, the defendant had the same right to act in self-defense as he would have had if it had in fact been the brother of the deceased whom he believed was attacking him, and a charge limiting these acts to the deceased was error.

Appeal from the District Court of Red River. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Kennedy, Robbins & Watson,* for appellant.—On question of general reputation of deceased: Earles v. State, 52 Texas Crim. Rep., 140, 106 S. W. Rep., 138; Smith v. State, 51 Texas Crim. Rep., 137, 100 S. W. Rep., 924; Arnwine v. State, 50 Texas Crim. Rep., 477, 99 S. W. Rep., 97; Arnwine v. State, 50 Texas Crim. Rep., 254, 96 S. W. Rep., 4; Wakefield v. State, 50 Texas Crim. Rep., 124, 94 S. W. Rep., 1046; Keith v. State, 50 Texas Crim. Rep., 63, 94 S. W. Rep., 1044; Gregory v. State, 50 Texas Crim. Rep., 73, 94 S. W. Rep., 1041; Melton v. State, 83 S. W. Rep., 822; Moore v. State, 79 S. W. Rep., 565; Meirs v. State, 34 Texas Crim. Rep., 161; Graner v. State, 14 Texas Crim. App., 113.

On question of excluding testimony of defendant's declarations saying that he thought he killed the brother of deceased and that the same was an honest mistake: Sherar v. State, 30 Texas Crim. App., 349; Berry v. State, 30 id., 423; Lewallen v. State, 33 Texas Crim. Rep., 412; Pratt v. State, 50 id., 227; Money v. State, 97 S. W. Rep., 90.

On question of the court's charge on self-defense: Jones v. State, 17 Texas Crim. App., 602; Tillery v. State, 24 id., 251; Gonzales v. State, 28 id., 130; Swanner v. State, 58 S. W. Rep., 72; Comegys v. State, 62 Texas Crim. Rep., 231, 137 S. W. Rep., 349.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was prosecuted, charged with murder and convicted of manslaughter.

In this case it appears that Alfred Diffie, a young man, called to see a daughter of appellant one Saturday night, and the next night she went to church with her parents, Alfred Diffie accompanying her home. Her mother and father getting home first, lighted the parlor, and retired to their room, her father undressing preparatory to retiring. Mr. Wilson says, after some minutes he heard a noise and heard his daughter calling him; he rushed in the parlor and Alfred Diffie had his daughter on the floor, one hand over her mouth to keep her from hollering; her dress pulled up exposing her limbs while he was down over her. Young Diffie admits that appellant came rushing into the room in his night clothes, but says he and the daughter were standing up, he merely hav-

ing hold of her hands. Both agree that an altercation immediately ensued in which Diffie's shirt and collar were torn off of him, appellant at the time calling to his wife to bring his gun. Alfred escaped and ran off, leaving town that night and going out in the country to spend the night. It is also shown that Alfred went to the drug store and purchased some condrums before going to Mr. Wilson's; he testifies that he secured them to have intercourse with another party. A man in the drug store says, however, that Alfred made remarks at the time indicating the party he was thinking of was appellant's daughter. Appellant made threats to kill Alfred Diffie, but was persuaded to go to Alfred's father, explain the circumstance to him, and ask him to send Alfred away, saying at the time if he met Alfred he felt that he would kill him. Judge Diffie did send Alfred away, but he returned home on the night of July 3. On July 4th appellant was informed that Alfred had returned, and was warned that Alfred was armed and was likely to kill him, appellant. He did not go to see Judge Diffie again, but sent him word that he had promised to send Alfred away, and insisted on him doing so, saying that if he met him he did not think he could control himself, but would kill him. Judge Diffie did send Alfred away on the night of July 4th, but appellant did not learn of that fact. He inquired after the 4th and before the day of the killing, and was informed by those of whom he inquired that they did not know, but thought he was still in Detroit. On Sunday appellant, his wife and daughter all attended church, the services being held in the tabernacle in that town. Wilmer Diffie, a younger brother of Alfred, also attended church, and sang in the choir. Appellant says he saw Wilmer Diffie and thought it was Alfred, thinking he saw Wilmer Diffie in the choir also. Several testify to appellant's nervous condition during the services, some saying that he kept his eyes on that portion of the choir where young Diffie sat. At the close of services appellant walked to one edge of the tabernacle and stopped, waiting for his wife. Wilmer Diffie started out also, and when he got in about eight to ten feet of appellant, appellant fired on him, the first ball apparently inflicting the death wound, striking him in the breast. Diffie turned and ran, appellant firing at least three other shots, one of them striking Diffie in the arm, the other striking him in the back. The State's contention is that Diffie was going towards the gate with his hat in his hand and made no demonstration whatever. Appellant contends that when he saw Wilmer Diffie approaching him he thought it was Alfred. To use his own language, he says: "I thought the way he was acting that it was Alfred Diffie, and I asked my wife if it was not and she told me to hush or pushed me down that way. If she told me whether it was or was not, I did not understand her. My eyesight is bad and my hearing is bad; at times my hearing is worse than others, and my eyesight is the same way; I suffer a great deal with kidney trouble and I have those spells often and during those times my eyesight is bad. As I sat there during the services I did not make up my mind fully as to whether

it was Alfred or Wilmer Diffie that was in the choir; I did not make up my mind fully until after services was over. As I sat there I was restless and nervous and agitated as you say, I could hardly stay there. As I sat there and was uncertain about this boy, all the wrongs that had been done my daughter came into my mind, and looking over and seeing my daughter my mind could not be otherwise. As I sat there I started to get up and made an effort once to get up and go before the services was over and my wife pushed me down, that is, caught hold of me, sort of held me down, and says, 'be quiet'; well, I sit there and when the services was over I gets up and starts on down the aisle. I walked a bench or two and I turned my head around to look to see my wife—my wife was talking to some ladies, there was two or three of them there talking together, Mrs. Dunagen and somebody else. I don't know who the others were—and I looked at her a few minutes, I saw she had made a start to start to come on and I turned to go on out, as I went on out at the end of the aisle, went out a step or two beyond the end of the aisle, I turned to look for my wife to come on, as I did so I discovered who I taken to be Alfred Diffie, coming rushing around the corner of the benches coming up towards me. I passed about four feet north of this north tier of benches. As I waited for my wife I turned my face south. When I saw Wilmer Diffie he was coming from the southwest, that is, at the west end of the benches he had got around coming on out, got around when I first turned and saw him; I saw him swing around the post, that is at the corner of the post coming right on; I seen him make a shift with his hat; he had his hat in his right hand and he shifted it to his left hand and was looking me right straight in the face with his eyes glaring and was walking rapidly and he advanced in four or five feet of me after he turned this corner. . . . He came rushing right on up, stepping rapidly towards me and made a motion back with his right hand, and I shot him as quick as I could, thinking it was Alfred. I fully believed it was Alfred Diffie I was shooting, and at that time I believed he was armed and was going to kill me. The reason I killed that man at that time was the way he had outraged my daughter, and thinking that he was going to shoot me, that he was going to take my own life, I shot him."

A closely contested issue in the case, both the State and defendant introducing many witnesses, was whether or not Alfred and Wilmer resembled to that degree that one could reasonably have been mistaken for the other. If appellant knew it was Wilmer Diffie approaching him, the slight demonstration he testifies to him making would hardly present the issue that he acted in self-defense; while, on the other hand, if he believed that it was Alfred Diffie thus approaching him, taking into consideration that his friends, Rumbley, Heath and others had informed him that Alfred Diffie was going armed and to keep a lookout or he would kill him, the acts, conduct and demonstrations he testifies to would raise the issue of self-defense. The killing occurred on July 7th, just three days after Alfred had returned to Detroit.

Appellant, when he fired the shots, ran, going by home and getting another pistol, and then disappeared. Between 12 o'clock and daylight he appeared at the home of his friend, P. M. Rumbley, coming in to surrender to the officers, he giving as his reason for leaving that he knew Judge Diffie was in attendance on church and he did so to avoid further trouble, and kept out of the way until he could surrender to the officers. He says when he got to Rumbley's, Rumbley informed him that he had killed Wilmer Diffie. He says this is the first time he learned that he had killed Wilmer and not Alfred; that he believed, up to that time, that it was Alfred Diffie he had shot.

Appellant desired to prove by Rumbley his acts, words and conduct upon being informed that it was Wilmer Diffie that he had killed. The court held this would be self-serving and excluded the testimony. We think the court erred in this respect. It was a sharply contested issue in the case whether or not appellant believed it was Alfred, and that he had shot Wilmer by mistake. The State to prove that he could not and was not mistaken in the identity of the two boys, asked him if Wilmer Diffie had not eaten at his home when he was present. This he denied. The State introduced witnesses to impeach him on this point who testified that Wilmer Diffie had been to appellant's house and took dinner there. He was asked if one witness did not point out Wilmer to him and say, "yonder comes Alfred now," and he replied, "No, that is Wilmer." He was sought to be impeached in regard to this matter. When he testified that he thought it was Alfred when he shot, the State sought to impeach the statement by showing association; that they attended the same church, etc. We think, under such circumstances, as supporting his testimony on the trial, it was permissible to show what were his words, acts and conduct at the time when first informed that it was Wilmer he had killed. Again, we understand the rule of law to be, when a person is first charged with any crime, his acts, words and conduct are admissible, if incriminating, in behalf of the State; if explanatory, in his own behalf. It may be said he knew he had shot a man; that is true. But he says he thought he shot Alfred Diffie, and if he did so believe the facts and circumstances would present the issue of self-defense. If the jury did not believe he so thought, they would hardly be justified in finding that he acted in self-defense. The issue is clearly in the case, as to whether or not he believed, at the time he fired the pistol shot, that it was Alfred Diffie or knew it was Wilmer Diffie. When first informed beyond question, or charged with killing Wilmer Diffie, he makes certain statements, which it is true will support his contention that he thought it was Alfred when he shot, but does that fact render the statements inadmissible? In theft cases when a person is first found in possession of stolen property, and is so informed, and in other crimes, when first charged with an offense, his explanation at the time has been held to be admissible, and we think, under both the above rules of law, the acts, conduct and words of appellant, when first informed that it was Wilmer Diffie he had killed,

should have been admitted. The rule is different, however, as to conversations had with Norris, Heath, Dr. Stiles and Alsobrook. Prior to that time he had been informed by Rumbley he had killed Wilmer Diffie, and he had time to reflect after being so informed, and the court did not err in excluding the conversations had with these latter gentlemen.

Again, the court permitted the State to prove that the reputation of Alfred Diffie as a peaceable, law-abiding citizen was good. In this we do not think the court erred. The defendant was relying on the fact that he had been informed by his friends that Alfred was going armed, and would kill him, as a justification for acting on the demonstrations, and under such circumstances it has always been held proper to prove the general reputation of such person.

However, the court erred in permitting the State to prove the reputation of Wilmer Diffie as a peaceable, law-abiding citizen, or as one witness puts it, "the best boy in Detroit." Appellant had not attacked the reputation of Wilmer; had alleged no threats of any character as against Wilmer, nor stated that he in any manner feared or had any reason to fear Wilmer would harm him. He relied solely on the question of mistaken identity and that he thought it was Alfred he was shooting, and testifies if he had known it was Wilmer he would not have shot. Under such circumstances it was error to admit evidence of the good reputation of Wilmer.

While not complained of in a way that we would be authorized to act thereon, yet as the case will be reversed we would call the attention of the court to the following paragraph of his charge on manslaughter: "The act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by the passion arising from some other provocation, *or a provocation given by some other person than the party killed.*" That portion which is italicized by us is wholly inapplicable to this case. The provocation relied on to reduce the offense was given by another party than the party killed,—Alfred Diffie. It was not contended that at the time of the killing, nor prior to that time, Wilmer Diffie had done anything that would cause anger, rage or resentment, and this paragraph of the charge should be so altered as to present the issue applicable to the evidence adduced on the trial. If appellant really believed it was Alfred Diffie when he shot, then he was entitled to all the defenses he would have been entitled to if it had in fact been Alfred Diffie.

In the charge on self-defense, if appellant believed it was Alfred Diffie, or the jury had a reasonable doubt of that fact, it should be made plain that he had the same right to act as if in fact it had been Alfred Diffie. The omission to so inform the jury is plainly manifest in the following paragraph of the charge: "Homicide is justifiable and is no offense against the law when committed in necessary self-defense. This occurs when one is attacked in such manner as to produce in his mind a reasonable apprehension of death or serious bodily injury, or

where it reasonably appears to one from the act or acts, coupled with the words of the *person killed,* that he, the slayer, is thereby in danger of death or serious bodily injury, and he kills to protect himself from such danger or apparent danger, then such killing is deemed to be justifiable self-defense."

It is thus seen that the court limited it to the acts and conduct of Wilmer Diffie (the person slain) while the contention of appellant was that he was informed that Alfred Diffie was going armed, was going to kill him, and he believed it was Alfred Diffie who was approaching him, and this charge should have been so framed as to present his theory, and if the jury found that defendant believed it was Alfred Diffie, or they had a reasonable doubt of that fact, then he would have the same right to act as if it in fact was Alfred Diffie approaching him.

The other matters complained of present no error.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*