**ROOK et al. v. KOONS.   (No. 2721.) ***

(Court of Civil Appeals of Texas.   Amarillo.
Nov. 10, 1926.   Rehearing Denied Jan. 5,
1927.   Second Motion for Rehearing Denied
Feb. 2, 1927.)

**1. Assault and battery ⬥13 — One believing
that persons he shot were parties who at-
tacked and threatened him on former occa-
sions was entitled to all defenses available
against latter.**

One believing that persons whom he shot
were parties who attacked him and threatened
his life on former occasions was entitled to
all defenses against them that he could have of-
fered had they been such parties.

**2. Assault and battery ⬥13—One previously
threatened and attacked may act more
promptly, on less demonstration of hostility,
than otherwise.**

One previously threatened and attacked is
entitled to act more promptly and upon less
demonstration of hostility than he would other-
wise have been.

**3. Assault and battery ⬥13—Natural excite-
ment and confusion should be considered, in
estimating nature and imminence of danger
and choice of means to avoid it.**

In estimating nature and imminence of dan-
ger, choice of means to avoid it or amount of
force or kind of weapon to be used in repelling
it, excitement, and confusion naturally result-
ing from surrounding circumstances should be
considered.

**4. Assault and battery ⬥13—Jury should con-
sider what they would do under same circum-
stances, in determining weight of defendant's
excitement and confusion as affecting esti-
mate of danger and choice of means to avoid it.**

In determining weight of defendant's excite-
ment and confusion as affecting estimate of na-
ture and imminence of danger, choice of means
to avoid it, or amount of force or kind of weapon
to be used, jury should consider what they would
be likely to do under same circumstances, with
honest purpose of avoiding danger without un-
necessarily taking life.

**5. Assault and battery ⬥13—Reasonable ap-
prehension of danger from defendant's stand-
point justifies necessary force to defend him-
self.**

Danger need not be actual to justify one in
using necessary force to defend himself, if he
acts on reasonable apprehension of death or
serious bodily injury, viewed from his stand-
point.

**6. Assault and battery ⬥13—Act manifesting
intent to execute threats must be reasonably
calculated to induce belief that threatened at-
tack has commenced to justify force in self-
defense.**

Act manifesting intent to execute threats
must be one reasonably calculated to induce be-
lief in mind of one threatened, viewing case from
his standpoint, that threatened attack has been
commenced, to justify use of force to defend
himself.

**7. Assault and battery ⬥42—Whether defend-
ant acted on apparent danger, viewed from his
standpoint, in shooting plaintiffs, held for jury.**

In action for injuries by shooting, evidence
*held* sufficient to take to jury question whether
defendant acted on apparent danger of death or
great bodily injury, viewed from his standpoint.

Randolph, J., dissenting in part.

Appeal from District Court, Wheeler Coun-
ty;  W. R. Ewing, Judge.

Consolidation actions by J. J. Rook and by
Cecil Rook, Majel Emler, and Mattie Emler,
respectively, by their next friends, against J.
P. Koons.   Judgment for defendant, and
plaintiffs appeal.   Reversed and remanded.

J. W. Sanders, of Canadian, and E. T.
Scott, of Wheeler, for appellants.

H. B. Hill and M. Reynolds, both of Sham-
rock, R. H. Cocke, of Wellington, and B. Y.
Cummings, of Wichita Falls, for appellee.

JACKSON, J.  Appellee alleges that at the
time and before the shooting in which plain-
tiffs were injured, he was and had been for
a number of months in fear of sustaining
death or serious bodily injury from Rex
Williams, Jack Clark, Philip Bentley, and
Altus Nunley, whose enmity he had incurred
and who had threatened his life, and by
whom he had been beaten on divers and
sundry occasions.

The testimony of appellee and his witness-
es tends to show that on the day preceding
Labor Day, September 2, 1923, Phil Bentley
passed defendant's home with a gun, cursed
and abused him, and dared him to come off
his premises into the road; that the appellee
remonstrated with Bentley, who was a boy in
his teens, went out into the road, and Bentley
struck at him with the gun, appellee warding
off the blows with his arms; that appellee
took the gun from Bentley and was told by
the young man, "I may fail this evening, but
I will get you"; that within a few days there-
after, while working on a public road, the
same Phil Bentley called appellee a ————
———— red headed s—— of a b——, and a
fight occurred in which Bentley, Williams,
and Nunley participated against appellee;
that one of them struck him with a singletree
and inflicted injuries on his jaw which ren-
dered him unable to eat anything but soup
for three days; that in May, 1925, Nunley
passed through appellee's premises, which
were posted "Closed," and that appellee and
Nunley on that occasion engaged in a wordy
difficulty;   that in September thereafter,
while appellee was on his way home from
Shamrock, traveling in his car on the pub-
lic highway, Altus Nunley, Rex Williams, and
another young man passed him, stopped their
car on a bridge so that he could not pass;
they got out and went back, made an as-
sault on him, and gave him a good beating,

telling him that if he reported the matter to the officers he would be pouring sand on his grave, and that they would get him; that a few days before the shooting, Clark and some other of the boys passed through appellee's inclosure and tore down his fence, a wordy altercation arose, and Clark told him, "I'll get you yet." The appellee, not voluntarily but when questioned by officers, reported the difficulty occurring on the public road at the bridge, and complaints appear to have been made against these boys. The appellee had requested the officers to protect him after he had been assaulted at the bridge, but no affirmative action appears to have been taken.

It will be noted that a number of the difficulties with these parties had occurred in front of appellee's home and on his premises. On the night of the unfortunate tragedy in which plaintiffs were shot, some time after 12 o'clock they drove their automobile along the public highway, running south of appellee's home about 60 feet, but the lights from a car traveling the road did not usually reach the house; but before reaching the house the lights of the car were turned so as to shine upon the porch where appellee's wife and daughters were sleeping; that they were using loud and vociferous language such as would have been, from appellee's testimony, calculated to disturb the peace. They passed on by his residence, turned their car around, and before passing the second time again turned the lights of the car on appellee's residence. They passed and came back, passing appellee's house the third time, stopped in the road near the house, and while stopped a man crossed appellee's premises and joined himself to the crowd in the car which was driven on a short distance and turned and came back again, passing the house; that each time they passed the house the car was slowed down; about the time they reached the residence the fourth time, some one from the car said, "Pour it on the son of a bitch," or, according to some of the testimony, "There he is; pour it on the son of a bitch."

The record is uncontroverted that appellee and the plaintiffs were friends and neighbors; that no ill will or enmity existed between them; and that appellee thought that the parties in the car were the ones who had made the threats against his life, and who had assaulted him theretofore. Appellee was unable to recognize any of the persons in the car, and it was not light enough for him to see what they were doing, except that they were moving along in the automobile.

I concur in the disposition of the case made in the majority opinion, but I cannot assent to the proposition that, under all the facts and circumstances in the case, appellee's plea of self-defense was not available.

[1] I am cognizant of the rule that threats shall not be regarded as a justification of a homicide unless it be shown that at the time of the killing the deceased, by some act then done, manifested an intention of executing the threats made. The record discloses without controversy that appellee believed that the plaintiffs were the parties who had attacked him on former occasions, and who had threatened his life. He was therefore entitled to all the defenses he could have offered if the plaintiffs had been Rex Williams, Jack Clark, Phil Bentley, and Altus Nunley. Wilson v. State, 70 Tex. Cr. R. 355, 156 S. W. 1185.

[2] The previous threats having been made to appellee, and attacks of violence having theretofore been made upon him, he was entitled to act more promptly and upon less demonstration of hostility than he would otherwise have been. 30 C. J. page 67.

[3, 4] "In estimating the nature and imminence of the danger, in the choice of means to avoid it, or the amount of force or kind of weapon to be used in repelling it, the excitement and confusion which would naturally result from the surrounding circumstances —for which the rioters alone were responsible—should not be overlooked. To require of the defendant, while under a high degree of mental excitement, induced by their wrongful and criminal conduct, and without his fault, the same circumspection, and cool, deliberate judgment, in estimating the danger or the choice of means for repelling it, as we, who are unaffected by the excitement or the danger, may now exercise in contemplating it, would be to ignore the laws of our being, and to require a degree of perfection to which human nature has not yet attained. Of the weight a jury should give to these considerations, no safer standard can be found than their own individual consciousness, and the consideration of what they, with the honest purpose of avoiding the danger, without unnecessarily taking life, might, under the circumstances in which the defendant was placed, be likely to do." Patten v. People, 18 Mich. 314, 100 Am. Dec. 173.

[5] It is settled, under our law, that a reasonable apprehension of death or serious bodily injury would justify appellee in using the necessary force to defend himself, and it is not required that the danger be actual, provided he acts upon a reasonable apprehension of danger, viewed from his standpoint alone, at the time he acts. If appellee was required to wait until an effort was made to take his life or inflict serious injury upon his person, before he acted, he could stand upon that fact without the antecedent threats, and such threats would be of no value or benefit to him for his right of self-defense would be complete without them. Miles v. State, 18 Tex. App. 156.

[6] "It is not practicable to fix on what the act manifesting the intention of the deceased to execute his threats shall be; but it must be some act reasonably calculated to induce the belief in the mind of the defend-

ant, viewing the case from his standpoint, that the threatened attack has then commenced to be then executed." Glover v. State (Tex. Cr. App.) 107 S. W. 854.

"As before stated, deceased had threatened the life of appellant, and of these threats appellant knew. Just before the homicide, deceased had acted in a manner calculated to produce serious apprehension that these threats would be put into execution. At the time the fatal shot was fired, the conduct of deceased was susceptible of two constructions—the one innocent, the other threatening. Now under this state of the case, what instructions should be given the jury? Abstract propositions? No; they will not suffice, though correct. There is but one issue presented, viz., had the appellant reasonable grounds for fearing death or serious bodily harm? To decide this issue correctly the relations of the parties to each other, their feelings towards each other, and the nature of those feelings, should be known to the jury. And not only should this be known, but the charge of the court should be so framed as that the jury might correctly comprehend the purposes for which the facts are admitted in evidence. They can be so presented as not to be upon the weight of evidence.

"Keeping in mind the issue, to what facts could the jury look in determining the issue? Clearly to all the facts; to those transpiring at the time, as well as those occurring before. If deceased had threatened appellant's life, this alone would not justify the homicide. To justify under threats it must be shown that, at the time of the homicide, the person slain, by some act then done, proposed to execute the threats. The threat being to kill, he must have manifested an intention to execute that threat. Now, if the act done manifests an intention to kill when viewed alone, disconnected from the threat, then the threat would avail nothing. The right of self-defense would remain with the accused, independent of the threats. But suppose the acts of the deceased, standing alone, were harmless in their import, but of a serious and deadly character when viewed in the light of the threats (which was a phase of this case), in such case the threats become of the first importance." Wheelis v. State, 23 Tex. App. 238, 5 S. W. 225.

[7] Considering that the record tends to disclose that appellee believed that the plaintiffs were the parties with whom previous trouble had been had, the violent attacks made upon him by such parties and the antecedent threats to take his life, together with the fact that the plaintiffs were very boisterous, that the lights of the car were turned upon the house, that the third time the car passed the house some one that appellee believed to belong to the automobile party crossed his premises and joined himself to the parties in the car, that each time the car passed the house it was slowed down, and that just preceding the shots by which the plaintiffs were injured some one from the car stated, "Pour it on the son of a bitch," or "There he is, pour it on the son of a bitch," that appellee was unable to see whether this language was followed by some additional act manifesting an intention to execute the previous threats, it is my opinion that under the law of threats and apparent danger, under appropriate instructions, the appellee is entitled to have a jury determine whether or not he acted from apparent danger, viewed from his standpoint. Collins v. State, 97 Tex. Cr. R. 31, 259 S. W. 941; Bayer v. State, 93 Tex. Cr. R. 310, 257 S. W. 242; Atkins v. State (Tex. Cr. App.) 280 S. W. 792.

Had the party in the automobile been composed of Williams, Clark, Bentley, and Altus Nunley, and conducted themselves as plaintiffs did on that occasion, would it be questioned that from the standpoint of appellee the danger was apparent, and the facts raised an issue of self-defense to be submitted to the jury?

The original dissenting opinion written by me is withdrawn, and this is substituted therefor.

HALL, C. J., concurs.

RANDOLPH, J. (dissenting in part). The following statement is taken from appellant's brief, but additional statements will be made as are necessary for a full understanding of the case:

"About the 9th of September, 1925, appellants Cecil Rook, Majel Emler, and Mattie Emler, minors, aged about 19, 14, and 12, respectively, together with another boy and girl, brother and sister of the Emlers, were driving along the public highway past the residence of appellee in Wheeler county, Tex., at about the midnight hour, and appellee fired upon them in the automobile with an automatic shotgun as they were passing his residence, discharging his gun five times and wounding all five of said persons, three of them, the appellants, seriously, and the other two slightly. The said Cecil Rook lost both eyes as a result of the shooting and sustained other injuries, and Majel Emler and Mattie Emler each lost one eye and sustained other injuries. Separate suits were instituted in the district court of Wheeler county by J. J. Rook, father of Cecil Rook, and by each of said minors by next friend, but thereafter, upon leave of the court, all of said causes were consolidated and plaintiffs filed a new pleading in the consolidated cause, the pleading on which they went to trial, in which they alleged the facts about their driving along the public highway past the appellee's residence, that the appellee unlawfully and without justification fired upon them with a shotgun five or six times severely and painfully and permanently wounding them; alleging that Cecil Rook lost both eyes and sustained gunshot wounds in his neck, ears, eyes, nose, mouth, gums, teeth, and head; Majel Emler and Mattie Emler each lost one eye and sustained gunshot wounds in their neck, ears, nose,

mouth, gums, teeth, eyes, and head; alleging painful lacerations, loss of blood, sickness resulting therefrom, and operations in the hospital as a result thereof, and the consequent physical and mental pain and suffering. Also alleging that Cecil Rook was a minor 19 years of age, and was working for his father, J. J. Rook, in the capacity of tool dresser in the business of oil well drilling, and would have continued to work in such capacity for his father until he reached his majority.

"Said pleading alleged damages to the said J. J. Rook, on account of expenses incident to the treatment of his minor son, Cecil Rook, and on account of the loss of his services for the remainder of his minority in the total sum of $6,133. Said pleadings alleged damages to Cecil Rook on account of the physical and mental pain and suffering and loss of earning capacity after he reached his majority in the sum of $60,000. Said pleadings alleged damages to the said Majel Emler and Mattie Emler on account of the physical and mental pain and suffering sustained by them, and the decreased earning capacity after they reached their majority, in the sum of $20,000 each.

"Appellee filed answer containing general demurrer, special exceptions, general denial, and special answer in the nature of confession and avoidance by pleas of self-defense, which will be set out when necessary for discussion below.

"Appellants filed first supplemental petition in replication to appellee's answer, containing general demurrer and general denial.

"Demurrers and exceptions were overruled, and a trial was had before a jury to whom said cause was submitted by general charge, and special charges requested by appellee, submitting the issue of assault and damages to appellants, and the issue of self-defense pleaded by appellee. The jury returned a general verdict for the appellee. Judgment was entered for appellee that appellants take nothing by their suit and that they pay the cost."

The court, in his main charge, charged the jury as follows:

"(4) A reasonable apprehension of death or of serious bodily injury will excuse a party for using all the necessary force to protect his person, or the person of any member of his family, and it is not necessary that there should be actual danger, provided he acted on a reasonable apprehension of danger, either real or apparent, viewed from his standpoint at the time. Each juror must place himself in the position of the defendant and determine from all the facts and circumstances as they appeared to him, the defendant, at the time he shot the plaintiffs Cecil Rook, Majel Emler, and Mattie Emler, whether his apprehension or fear of death or serious bodily injury to himself or any member of his family was reasonable.

"(5) Now, you are instructed that if you believe from the evidence that at the time the defendant, J. P. Koons, shot the plaintiffs Cecil Rook, Majel Emler, and Mattie Emler, the said plaintiffs, or either of them, or any other person riding in the car with said plaintiffs at said time, were committing some act, coupled with words, or committing acts without words, which produced in the mind of the defendant, J. P. Koons, the belief that he or the members of his family were in danger of death or sustaining serious bodily injury, and you further find from the evidence, viewing the situation from the defendant's standpoint, and his standpoint alone, that at the time of said assault, if any, the defendant had reasonable grounds to apprehend such danger or apparent danger, if any, and that he did apprehend it, then in such event you will find for the defendant."

Complaint is made of the refusal of the trial court to sustain the plaintiff's general demurrer to defendant's answer, for the reason that such pleading does not allege any hostile, overt act or demonstration of any kind directed to the appellee, or any member of his family, such as in law would raise the issue of self-defense, and that no evidence of any such act or demonstration was introduced before the jury warranting the court's main charge, wherein the jury was instructed that they would have to find that the defendant was not acting in defense of himself or any member of his family; further, that the court erred in submitting the issue of self-defense in his main charge and in defendant's special charges 1 to 5, inclusive, for the reason that no evidence of any overt act or demonstration on the part of the plaintiff was introduced in evidence to require or justify such charges.

Defendant, among other matters of defense, alleges as follows:

"For special answer, if required, the defendant says that he is not liable to the plaintiffs, or either of them, in any sum as damages for the reason that his act in shooting the plaintiffs was not done intentionally, wantonly, or maliciously, but, on the contrary, the defendant alleges that the occasion for said shooting arose on account of the wrongful act of the plaintiff and the plaintiff's companions in the automobile at the time of the shooting. In this connection the defendant alleges that at and before the time of the shooting in which the plaintiffs were injured, the defendant was and had been for a number of months in fear of sustaining death or serious bodily injury from the hands of certain persons residing in the community in which he lived; that on more than one occasion he had been assaulted and beaten without provocation on his part; that he had incurred the enmity of certain persons, to wit, one Rex Williams, Jack Clark, Philip Bentley, and Altus Nunley, and that he had been beaten by said parties, and that they had on divers and sundry occasions threatened to do him serious bodily harm; that on account of the acts and conduct and language of said parties he had reason to believe and did believe that said parties, either or all of them, would take his life or do him serious bodily harm; that on the night he shot the plaintiffs and the other persons in the automobile in which the plaintiffs were at the time, he and his family, consisting of his wife and two girl children, had retired and gone to sleep and had been asleep for several hours, the defendant sleeping on the inside of the house and his said wife and children sleeping on the front porch of his home, and that in the late hours of the night, to wit, between 1 and 2 o'clock, he and his family were aroused from their slumbers by

the wrongful and unlawful acts of the plaintiffs and their companions who were riding in an automobile along the public road in front of the defendant's house, and that the plaintiffs and said companions went at said time near the private house of the defendant and did then and there use loud and vociferous language in a manner calculated to disturb the inhabitants of said private house, and did thereby disturb the said defendant and his said wife and daughters; and that, on account of such conduct of the plaintiffs and each of them, the defendant alleges that he was caused to believe and did believe and had reasonable grounds to believe that he and the members of his said family were in danger of sustaining death or serious bodily injury at the hands of said persons in said automobile, and he alleges that this is especially true, in view of former threats and assaults that had been made concerning and upon him by persons residing in said community. The defendant further alleges that the persons in said automobile so turned the same as to cause the lights to shine upon the house of the defendant, and that they drove past his house several times and each time caused the lights to be so turned, and that the conduct of the said parties in said automobile amounted to a disturbance of the peace; that on account of said acts and conduct and language of said persons in said automobile, and because of the fact that it was nighttime and dark to the extent that defendant could not see what was being done by said persons in said automobile, and could not tell who they were, the defendant, upon reasonable grounds, was in fear for the safety of himself and family, and he believed that said parties in said automobile intended to do harm to the defendant and his family; that just before he fired upon the parties in said automobile one of said parties stated, in substance, 'There is the son of a bitch, pour it on him' [meaning the defendant], which defendant then and there understood to be a threat to do him immediate serious bodily harm or inflict death upon him, and that in such fear and alarm produced thereby, and because of the threats and assaults theretofore committed against him, and because of the belief that the parties in said automobile were the same parties who had threatened and assaulted him, and because of the belief that they were about to again assault him and do him serious bodily harm, and because he could not see and recognize them on account of the darkness, he fired upon them for the purpose and for the purpose only to protect himself and his said family from what he believed to be an assault against him and his said family, and he alleges that at the immediate moment that he shot, it reasonably appeared to him from his standpoint that he and his family were in immediate danger of sustaining death or serious bodily injury at the hands of said parties in said automobile; and that, on account of all the facts herein alleged, he says that in firing at the time and under the circumstances that he did, he was guilty of no wrong toward the plaintiffs or the other parties in the automobile, and he denies that he was guilty of any wrongful, intentional, unlawful, or malicious act; and that he therefore says that he is not indebted to the plaintiffs in any sum whatsoever."

The defendant's special charge No. 1 informs the jury that:

"If you believe from the evidence that on the night the plaintiffs were shot, the defendant had become alarmed by reason of the acts, conduct, or words of the plaintiffs, or either of them, and that he believed himself or his family in danger, then he had the right to arm himself with a shotgun and go out of his house into the yard for the purpose of protecting himself and his family from any danger that he may have reasonably believed to have existed at the time."

Defendant's special charges Nos. 2, 3, and 5 base his right to shoot the plaintiffs upon the apparent danger to himself or family in that "by acts, words, or conduct," the plaintiffs caused the defendant to reasonably believe that they did intend to inflict death or serious bodily injury upon him or upon any member of his family.

Was the conduct of plaintiffs at the time of the shooting, viewed from the standpoint of the defendant, such as in law could reasonably cause the defendant to apprehend from them death or serious bodily injury to himself?

The defendant testifies to difficulties antedating the shooting, from three years down to four months of the shooting, with boys in the neighborhood. He also testified to have been beaten by certain boys at another time, and that about nine days before the shooting he had words with a boy named Jack Clark when Clark opened and went through a gate marked "Closed" on his premises, and that Clark cursed him, and as he drove off Clark said to him, "I will get you yet"; that the relations between him and the families of the plaintiffs had been perfectly friendly, and that there was no ill feeling on his part towards the plaintiffs at the time of the shooting; that the Emler boy had worked for him and that he had furnished Mr. Emler feed and cotton seed to plant his crop. As to the evidence occurring on the night of the shooting, the defendant testifies:

"On the night of the shooting I went to bed about 9 or 9:30, somewhere along there, maybe 10. My wife and daughters were sleeping on the front porch. I have three daughters—the little girl here this afternoon and two others who are sick. I went to sleep after I went to bed, and was later awakened, couldn't say what woke me, but I could say what the noises were that I heard after I woke—the dogs were taking on like they were trying to eat up something—anyhow, they were barking very viciously, and the next thing that attracted my attention was a car light shining on my front porch and house. "The road in front of my house runs east and west, and my house fronts to the south; it is about 60 feet, I think, from the front porch to the road. Ordinarily, the light from a passing automobile is not thrown on the porch or house. The road there in front of the house is 40 feet wide. Most of the traffic is on the south side of the road, that is, to the south of the center line of the road, and I don't think there is any traffic north of the center line. I was attracted by the automobile lights shining on my porch, while I was in the east room, but I did not get up at that time, though I could see the automobile

about 200 yards down the road when I first saw it, east of my house, standing still; it stood there about two or three minutes, and then come on up. As the car come on up from the place where I had seen it stopped down there, I heard noises and voices in the car—I thought it was a man's voice, using loud and boisterous words. The car went on by the house, going west, traveling slowly, and as the car passed the house the parties in it continued to make these noises. They went on about a mile west before they stopped, and there they seemed to check up or stop a little, and then turned around and headed the lights back toward the house, and came on back toward the house, and when they got to the house they were driving slowly. In the meantime, immediately after the car had driven by west the first time, Mrs. Koons had come into my room, thought I was asleep, and shook me and says, 'Papa, did you see that?' and from her conversation and manner she appeared to be excited; I told her I had seen it. After she went back out to the porch I got up and went to the west end of the house, through the hall, and through the west room, didn't go out onto the west gallery, but stood inside the house. This was after the car had passed the first time, going west, and while it was still going west. I stood there until the car turned around and started back, and then I went back to bed, got in bed. I did not get up again until it passed going on east, the first time, the second time it had passed the house. The car came back again, then, after going east. I did not go back to bed any more after I got up the second time. After the car passed the house going east, it went about 200 yards and turned around and headed the lights back west. When it got near the house, the lights from the car shone on the porch. During all this time I was excited, because I was in fear for the life of myself and danger to my folks, caused by having been beaten up and threatened by these other parties, and the movement of the car by my house, and the number of times it passed there, and the manner in which the lights shone on the house, was calculated to have something to do with my excitement. I thought the parties in that car was some or all of these boys that had threatened my life. As stated, when they went east and turned around and started back, I had then gotten up, and was at the east window. I did not have my gun at that time. The car, then, passed my house again, going west the second time. At one of these times when the car was east of the house, headed west, I had seen what I took to be a man on my premises, in what I call the horse pasture, east from the house. This object was moving in the direction of the automobile, and at that time I thought it was a member of the party that was in the automobile, going back to the automobile. At the time the car came back, going east the second time, I did not have my gun, and did not have it when the car passed the house going west the second time, but got it when the children ran in at the door, and the lady, and as they came back the fourth time. When my wife came into the room the first time the children were not with her, but she had left them on the porch. My wife and children almost ran over me as they came into the house, and as I started to the door they passed me and I got the gun. At that time my wife and children appeared to be greatly excited. I couldn't say where they went to,

but the last I saw of them they were going in at the hall door, and that is when I grabbed my gun and ran out to the west end of the south porch—that is the front porch of the house, fronting the road. I had not stopped to put on any clothing, and was just dressed in my night clothing, had on no shoes or socks. I ran out into the yard. At that time I presume the moon was up something like an hour high in the east, and there were a few passing clouds in the east; don't know about other places. I could not see the parties in the automobile plainly enough to recognize them. When I got out into the yards, in my night clothes, barefooted, with my gun, somebody in the car said, 'Pour it on the son of a bitch,' besides the hollering—they were hollering like wild Comanches. I thought this language I have just quoted came from the occupants of the automobile. At that time my condition of mind was such that I thought it was only a matter of a second there when they would kill me, that is what I figured, and I shot. I positively do not know how many times I shot, for I was too badly excited, I guess. I do not know where my wife and children were at that time, but the next I saw of them they were coming back out of the front door, just a minute or so after I shot, or in just a short time, of course. I did not detect that there were girls in the automobile until my oldest daughter says, 'Paps, I believe there are girls crying,' or something to that effect, and I threw my gun down and ran to them. I threw the gun down in the yard, and didn't take it back to the house. I ran out to the automobile, and carried Cecil Rook into the house, and Mary Emler walked along and tried to assist me, and the other two girls walked along and followed. I got them on the bed and told the lady to get the mentholatum or anything she could to soothe them, and I would go for their parents. If I had known or believed that this was a party of young people out cutting up, singing, and hollering, and that they intended to do me no harm, or my family no harm, I would certainly not have shot them. I would not have shot into that automobile if I had not thought my family was in danger. Even if I had believed it was the Williams boy, or the Clark boys, or the Bently boys, or anybody else, I positively would not have shot them if I had not believed I was in danger at the immediate moment."

It appears, therefore, that defendant's claim of self-defense turns upon the question whether he could, from the language used, have reasonably inferred that the parties in the car were about to inflict upon him death or serious bodily injury. In other words, as the car came back down the road, and the words, "Pour it on the son of a bitch," were used by an occupant of the car, as we are compelled to consider them used for the purpose of this discussion, would those words, used in the nighttime, take the place of an overt act—an act or acts and words, required by the statute to justify him in the shooting?

Article 1221, Revised Penal Code 1925, provides:

"Homicide is permitted in the necessary defense of person or property, under the circumstances and subject to the rules herein set forth."

Article 1222, in so far as it applies to the case at bar, is as follows:

"Homicide is justifiable when inflicted for the purpose of preventing murder, rape, robbery, maiming, disfiguring, castration, arson, burglary, and theft at night, or when inflicted upon a person or persons who are found armed with deadly weapons and in disguise in the nighttime on premises not his or their own, whether the homicide be committed by the party about to be injured or by another in his behalf, when the killing takes place under the following circumstances: 1. It must reasonably appear by the acts or by words coupled with the acts of the person killed that it was the purpose and intent of such person to commit one of the offenses above named. 2. The killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense."

We recognize the rule to be that the defendant may act upon appearance of danger as well as when in actual danger, but this right is limited by the law, and the law says what shall be the conduct of the party killed that will create that appearance of danger. While relying upon such appearances of danger, he must act with caution and prudence. Ater v. Ellis (Tex. Civ. App.) 227 S. W. 222.

As we understand the language of the statute, quoted above, to entitle the defendant to exercise a right to shoot, the hostile intention of the party shot must have been manifested by an act, or act coupled with words. We have been cited to no case which holds that words alone may be taken as such manifestation, without an overt act or demonstration.

"Self-defense, under the theory of apparent danger, may be brought about by the act of the party coupled with his words, or by the act without the words." Andrus v. State, 73 Tex. Cr. R. 332, 165 S. W. 190; Dugan v. State, 86 Tex. Cr. R. 130, 216 S. W. 163.

In the case last cited, Justice Morrow says:

"The unlawful intent of the person killed 'must reasonably appear by the acts, or by words coupled with the acts, of the person killed.' In a proper case—that is, one in which the evidence shows that the *language* of the deceased may have given color to his *acts* [italics ours] the charge should be so framed as to give the accused the benefit of the language as well as the acts of the deceased, and in such case its limitation to the acts alone has been uniformly held harmful error."

This, we take it, was the intent of the particular wording of the statute, that, where the words uttered explained the demonstration, they should be admitted in connection with the proof of the demonstration.

Article 1143 of said Code expressly declares that no verbal provocation justifies an assault and battery, but that it may be used in mitigation of the offense. Of course, the defendant here is not seeking to defend on the ground that he was provoked into the difficulty, but we cite this article for the purpose of showing the attitude of the law towards the use of words as a defense to a criminal action.

Waiving any discussion as to the condition of the plaintiff's mind at the time of the shooting, and, for the purpose of this discussion, conceding that he was of the opinion that he was about to suffer death or serious bodily injury, were the defendants guilty of any overt act which would justify him in such conclusion? The facts in the Ater Case, cited by the defendant, do not make the holding upon the question of overt act or demonstration applicable to this case. In that case the injured party was a trespasser on the premises of the party shooting him at a late hour of the night, and was caught in a position indicating a felonious intent. When accosted and asked what he was doing there he attempted no explanation, but raised up, and the party shooting him testified that he then shot him under the belief that the injured party was about to commit a felony.

In this case the plaintiffs were not on the defendant's premises, but riding up and down the highway in the moonlight. It is true that the defendant testified that he saw what he took to be a man crossing his horse pasture and going towards the car, and that he thought it was a member of the automobile party going back to it. This cannot avail him, for the reason that the party had withdrawn from his premises and was not in any threatening attitude, and the shooting did not occur at that time. In the Ater Case the very presence of the trespasser upon the premises in the night, his apparent desire for secrecy, his attitude in stooping to see under the window shade, all convey a potential threat to commit one or more of the felonies named in the statute.

In the case at bar, these young people were joy-riding up and down the highway, and it may be that they were guilty of such boisterous talk as would constitute a breach of the peace, as defined in article 474 of the Penal Code, yet their conduct was not such as to indicate an intent of committing a felony, or of committing an assault upon the defendant, unless the alleged use of the words, "Pour it on the son of a bitch," was a threat to do him a personal injury. Not only are we called upon to say that this was an overt act, but we are also called upon to designate the defendant as the party referred to. He says that he was standing in the yard with his gun ready to "pour it on."

We desire to say here that defendant's counsel in their brief alleged that just before defendant fired upon the party in the automobile, one of said parties stated, in substance, "There is the son of a bitch, pour it on him." This is not correct. The defendant testified that the language used was as quoted by us above.

We do not think that the use of these words

constitutes the equivalent of the demonstration required by the statute before the defendant would have been justified in shooting. If they were "singing and hollering" as the defendant testified, such conduct did not evince minds fatally bent on mischief, even to one in a frenzy of fear.

As supporting this view of the case, we also cite 2 R. C. L. pp. 548, 549, § 27; 30 C. J. p. ?0, § 176; Clark v. State, 51 Tex. Cr. R. 519, 102 S. W. 1136; Duke v. State, 61 Tex. Cr. R. 19, 133 S. W. 432, 436; Wallace v. Stevens, 74 Tex. 559, 561, 12 S. W. 283; Bryant v. State (Tex. Cr. App.) 47 S. W. 373, 375.

What we have said as to the necessity of the defendant's proving an overt act coupled with words. before he can justify himself on the ground that the parties shot manifested an intention to do him a serious bodily injury or kill him, is also applicable to the defendant's special charge on threats.

Article 1258 of the Penal Code provides as follows:

"Where a defendant accused of murder seeks to justify himself on the ground of threats against his own life he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the killing unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threat so made. In every instance where proof of threats has been made, it shall be competent to introduce evidence of the general character of the deceased. Such evidence shall extend only to an inquiry as to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition, or whether he was ·such a person as might reasonably be expected to execute a threat made."

This article clearly intends and provides that before a defendant can justify an assault or a killing on the ground of threats against him, there must be at the time of the killing or assault some act then and there done by the party assaulted or killed manifesting an intention to execute the threat. Alexander v. State, 25 Tex. App. 260, 266, 7 S. W. 867, 8 Am. St. Rep. 438; Miles v. State, 18 Tex. App. 156, 171; Dobbs v. State, 54 Tex. Cr. R. 550, 113 S. W. 923, 924; Smith v. State, 55 Tex. Cr. R. 628, 118 S. W. 145, 146; Bryant v. State, supra.

The law of self-defense is the same in civil as in criminal actions. March v. Walker, 48 Tex. 372, 377; Haverbekken v. Johnson (Tex. Civ. App.) 228 S. W. 256.

Another of plaintiffs' exceptions to the court's charge and to his action in submitting the issue to the jury relates to the defense of the defendant on the ground⁴ that his family was in danger of death or serious bodily injury. The court should not have submitted that issue to the jury. No trouble had ever been had by defendant's wife and children with the parties who had beaten and threatened the defendant. At the time of the shoot-

ing his family had retreated to a place of safety and were not in sight. The defendant knew this for they had passed him in the hall in their retreat. The parties in the car had made no effort to enter his premises or to invade his house. The only danger that he could possibly have anticipated by way of personal injury was a shot from the car directed at him. Hence his family were not involved.

It was not necessary for the plaintiffs to tender a special charge to cure the vices in the court's charge which they complain of. The error of the court was not an error of omission, but it was affirmative error. For the plaintiffs to take advantage of this error, in order to be able to present it on this appeal, it was only necessary for them to except to the main charge and the special charges in order for them to be able to present the errors to this court. Gulf, C. & S. F. R. Co. v. Conley, 113 Tex. 472, 260 S. W. 561, 32 A. L. R. 1183.

The trial court erred in admitting the testimony as to uncommunicated threats. Such threats as were not communicated to the defendant could have no influence upon the condition of his mind, and, as the party making the threat was not the party shot by the defendant, certainly, the uncommunicated threats were not admissible on the question of the intent of the parties charged with conduct leading to the shooting.

The trial court did not err in admitting the testimony of Luther Brazier to the effect that Jack Clark had stated to him that he would not have cared if the boys who had a fight with appellee had killed him, under the trial court's view of the case. However, in view of our holding that the evidence does not ′ furnish a basis for self-defense, said testimony becomes inadmissible.

Plaintiffs allege error in the trial court in refusing to sustain their objections to the verdict of the jury, for the reason that in their deliberation in the jury room, after they had retired to consider their verdict, the jury took into consideration the financial worth of the defendant, the pendency of the criminal indictments against him, and, further, that they considered said cause as a criminal case, and decided that the plaintiffs must prove their case "beyond a reasonable doubt." The plaintiffs set out the evidence of the witnesses as to the misconduct of the jury at length, but, as these questions may not arise again upon another trial, we will not enter into a full discussion thereof. It. is sufficient to say that the evidence introduced sustains the charge made by the plaintiffs that the misconduct of the jury in considering extraneous matters indicates to our minds that they were unduly influenced by such matters so considered by them. It is certainly reasonably doubtful, to say the least, whether or not.the verdict was so influenced, and it should have been set aside. Hines v.

Parry (Tex. Com. App.) 238 S. W. 886; Moore v. Ivey (Tex. Com. App.) 277 S. W. 106; Great West Mill & Elevator Co. v. Hess (Tex. Civ. App.) 281 S. W. 234.

The Legislature passed an amendment to the then existing law, providing for the terms and date thereof of the district courts of the Thirty-First judicial district. This case was tried in the district court of Wheeler county. Hemphill is a county in the same judicial district with Wheeler county. In the amended act only one term of the district court in each year was provided for Hemphill county, and the plaintiffs insist that, as the Constitution of the state provides for each county to have at least two terms of court, the act is void.

In the case of Felker v. Hyman (Tex. Civ. App.) 135 S. W. 1128, and other cases cited by plaintiffs, it is held that where an act is passed changing the terms of the district court, and such act takes effect at a time when it would not be possible for a county in the district to have more than one term of court in that year, the act is void. The exact point involved in this case, however, was not decided in the cases cited by plaintiffs, while we think that they do apply by implication; however, in the case of St. L. S. W. Ry. Co. v. Hall, 98 Tex. 480, 85 S. W. 786, in an opinion by Justice Williams, the Supreme Court of Texas, passing upon the very question here discussed, says:

"Much that is essential to the existence of the courts is thus prescribed by the Constitution itself, while some of the things needed to bring them into active operation are to be provided by the Legislature. The districts must be formed and the times for holding the courts prescribed by legislation, and without these there is no court authorized to exercise the jurisdiction defined by the Constitution. The contention here is that, although the Legislature has defined the territory to compose the district and has fixed times for holding the court twice a year in two of the counties and once a year in the third, it has not done enough to authorize the appointment of a judge and the holding of court, because of the omission to provide for a second term in each year in the third county. To us this contention seems to mistake the nature of the provision for two terms, by treating it as an inhibition of any provision for one term. As terms of courts cannot be held until times are prescribed by law, it is plainly the duty of the Legislature to make such provision. But this is an affirmative command and not a prohibitory provision. The courts have no power to enforce the performance of this duty in whole, and, in our judgment, have as little right to strike down, as unauthorized, a performance of it in part, merely because the Legislature has not gone as far as the Constitution may require. When the Legislature has provided for one term in a county, it has not done a thing prohibited or unauthorized by the Constitution, but has done a part of that which the Constitution commands it to do. If there had been no judicial districts when the Constitution was adopted and the Legislature, in forming them, had provided for only one term of court in each county in the state, can it be true that the people would have been deprived of courts because the provision made stopped short of that intended by the Constitution? If the Legislature, in session in January, should form a new district or add a county to an existing district and provide for a term of court in March, and, after that had been held, the Legislature, being still in session, should further provide for another term in the same county in September, we suppose no one would say that the courts could not legally be held under this authority or that its proceedings would be void. Yet to that proposition we would inevitably be led by adopting the contention that to the construction of a valid district and a lawful court antecedent provision for two terms a year in each county of the district is essential. If the Legislature, in forming a district, by oversight fails to provide for one of the regular terms in one of the counties, or, in attempting to so provide, employs such uncertain language that the time cannot be legally ascertained, would it not be unreasonable in the extreme to hold that the whole act, the court, and all of its proceedings are to be treated as if they had never been? We cannot yield our assent to a doctrine leading to such consequences. In our opinion, provision made by the Legislature for one term of a court a year is within the authority conferred and is a partial performance of the duty imposed by the Constitution; and, if it be true that this is not the full measure of such duty, that does not authorize the courts to say that it is not within the authority. The decision in Whitener v. Belknap, 89 Tex. 273 [34 S. W. 594] does not at all militate against this conclusion. It only applied the well-recognized rule that a court can only be held at the place fixed by law for its sessions, which place is fixed by the Constitution at the county seat."

We therefore hold that the act is not void for the failure of the Legislature to make provision for two terms of court each in Hemphill county, as we think this the better rule.

The matters discussed dispose of all questions of importance in the case, or those that are likely to arise upon another trial, and all other assigned errors are overruled.

We therefore reverse the judgment of the trial court, and remand the case to that court for a new trial.