On October 24, 1943, at about eight o'clock p.m., plaintiff's son, a young man fifteen years of age, was shot and severely wounded by the defendant, Warren E. Kuntz, while he was trespassing upon the premises of defendant located on Octavia *Page 279 
Street in the City of New Orleans. Charging that defendant's act was willful, wanton and without cause or justification, plaintiff brought this suit to recover the sum of $3414.58, representing the expense he has borne as a result of the shooting, and $45,000 for and on behalf of the minor for the latter's personal injuries.
The defendant admits the shooting but seeks to avoid liability on the ground that his act was fully justified under the circumstances of the occasion. He alleges in substance that, for a period of more than a year prior to the shooting, he and his family had been repeatedly annoyed, harassed and threatened by a prowler on and about the grounds of his residence and at the windows and doors thereof; that the object and purpose of these strange nocturnal invasions was not definitely known to him but that the intrusions were apparently directed against his wife and daughter and that he concluded, after many repetitions of the unlawful acts, that the safety and well-being of his wife and daughter was in danger; that, shortly after the beginning of the mysterious trespasses, he notified the Police Department of the City of New Orleans and that thereafter, on many occasions, summoned policemen to his home and had them stationed in and about his residence in an attempt to apprehend the intruder but without success; that, in addition, in an effort to protect his family, he installed a flood light illuminating the side yard of his premises and kept a bridge lamp with a powerful globe burning in his wife's bedroom; that, despite these precautions, the invasions into the privacy of his home became more frequent and bolder in character, causing him to fear that the intruder would actually break into his residence and attack his wife and daughter; that, on October 20, 1943, a tall young person, who disappeared before he could be apprehended, was discovered in the driveway of his residence; that, on October 23, 1943, the night immediately preceeding the shooting, defendant's wife was in her bedroom when she suddenly observed the face of a person peering into the window from the outside, causing her to scream in fright; that he was advised by the Police Department of New Orleans that it would be impossible for it to keep police officers constantly in surveillance of his residence; that, in its opinion, a sex pervert was responsible for the nightly visitations and that he, defendant, should secure a gun and protect his family by force of arms. He further avers that, in view of the continued outrages and the nervous strain to which he and the members of his family were thereby subjected, he adopted the advice of the police department and borrowed a revolver from a friend; that, shortly after eight o'clock on the night of October 24, 1943, he stationed himself in the living room of his residence, armed with the revolver, waiting for the intruder to return; that, while thus stationed, he saw a tall figure in the driveway in close proximity to the house; that he called through the open window for the intruder to halt but that the latter, instead of obeying his command, continued his advance towards his wife's bedroom window and that he fired three shots at the person, in order to repel the invasion, being convinced that the intruder intended to do bodily harm to the members of his family.
He further declares that, immediately after the shooting, he discovered that the person wounded by him was plaintiff's son and he charges, on information and belief, that plaintiff's son did not enter his premises for the purpose of urinating (as had been alleged by plaintiff in his petition) but, on the contrary, with the object and design of prowling, intruding and generally invading the premises for unlawful practices.
After a trial of the case on the issues formed by the pleadings, there was judgment in the District Court in favor of the defendant. Plaintiff has appealed.
A review of the voluminous record in the ease, which contains over 300 pages of testimony, and a careful study of the law applicable to the issues involved has convinced us that the main questions presented for decision are ones of fact. The jurisprudence applicable to cases of this sort, which we shall later discuss, seems to be well settled in this state. Defendant admits that he shot a trespasser upon his premises but he asserts that he was justified in so doing because he had good cause to believe that plaintiff's son entered the premises with a *Page 280 
design of doing bodily harm to his wife and daughter. If the previous invasions upon defendant's premises were such as to lead a reasonable man to believe that the persons of his wife and daughter were insecure, then the District Judge was correct in denying recovery. Let us, therefore, set forth the evidence produced in the court below in order to determine whether or not error has been committed.
Defendant is a reputable and successful business man holding the position of Vice President and General Manager of the New Orleans Furniture Manufacturing Company. He was about forty-five years old when the shooting occurred and has lived with his wife and daughter at No.1412 Octavia Street for approximately nine years. The house in which defendant lives is a duplex apartment situated in a very respectable neighborhood of New Orleans. Defendant and his family occupy the lower apartment and Mrs. Vivian Gelpi, a widow, occupies the upper. The lower apartment consists of several rooms. The front room, from where the shot was fired, is used as a living room. Immediately to the rear is defendant's bedroom, which is occupied by himself and wife, and to the rear of this room, adjacent to the rear yard, is the bedroom of defendant's daughter, Warrene, who is presently married to one Ralph H. Billington. The bedroom windows of the Kuntz apartment face a common driveway on the Prytania Street side of the residence which leads to a garage in the rear of the property.
Defendant's daughter was a young lady nineteen or twenty years old at the time of the alleged invasions of defendant's residence. Defendant's wife was 38 years old. Plaintiff's son was fifteen years old at the time of the shooting. However, he was apparently a well-developed young adolescent, six feet one inch in height and weighing one-hundred fifty pounds.
The evidence produced by the defendant unfolds a story of repeated trespasses, intrusions and harassments dating from the month of September 1942 until after the night of the shooting. Fannie B. Nixon, who has been in defendant's employ for several years as a maid, testified that, during September 1942, she noticed, on a number of occasions upon coming to work in the morning, that the rear gate of the premises was unlocked; that at other times, she found that a chair had been taken from the rear shed and placed in a position so that it could be used to peep into one of the windows of the room of defendant's daughter and that, in some instances, she discovered the presence of footprints at or near the bedroom windows of defendant's home. She further testified that she reported these facts to Mrs. Kuntz and that the latter and the defendant took steps to discourage the prowlers by erecting lights at the rear of the premises and also by summoning the police for assistance.
Defendant and his wife testified that, when their maid reported the evidence of the presence of a prowler or intruder in and about their premises, they took the matter lightly, being under the belief that the nocturnal visits were evidently boyish pranks which would cease in due course. However, they say that, when the visitations became more frequent, they naturally became alarmed; that, after viewing the evidence of foot prints at or near their bedroom windows and the occasional presence of a chair (which had evidently been taken from the rear shed connected with their premises) under a bedroom window, they decided to summon the police; that, when the police came, they explained to the officers the transgressions which had been disturbing them and that the officers seemed to think that the intrusions were due to some person or persons who derived pleasure from peeping into the windows in the hope of witnessing the disrobing of the female members of the family. The police evidently felt that the invasions were grave in character — for they posted officers and detectives at or near defendant's residence for several nights. Unfortunately, during the time that the officers were present, the invasions did not occur and the intruder was not apprehended.
Defendant and his wife further say that, as soon as the officers stopped coming to the residence, the intrusions began again and continued practically without interruption until October 24th 1943, the night of the tragedy. As an additional precaution, defendant erected a large flood light in the *Page 281 
rear of his premises and also kept a bridge lamp, burning brightly each night, near the window of his bedroom for the purpose of deterring the intrusions. These steps, however, were of no avail as the intruder often unscrewed the flood light to the rear of the premises when he came on his nocturnal jaunt.
Much evidence in support of defendant's story is found in the record. Miss Dorothy Wiltz, a friend of defendant's daughter, stated that on a number of occasions she stayed with Mrs. Billington, while defendant and his wife were out, as they were afraid to leave their daughter in the house alone. She relates that, on two of these occasions, she and defendant's daughter heard noises outside of the bedroom window and, becoming apprehensive of their safety and in fear of imminent bodily attack, they crawled in an hysterical state into defendant's bedroom where they hid under the bed until defendant and his wife returned to the premises.
Mrs. Vivian Gelpi, who occupies the upstairs apartment, stated that she knew of the fear and trepidation under which defendant and his family were living and that she, too, was afraid of attack — so much so that the night before the shooting she loaned defendant a pistol for her own protection as well as that of himself and his family.
Another neighbor, Miss Ethel Scott McGehee, who is connected with the McGehee School for Girls, testified that there were similar peeping invasions in and upon her premises, which are closely situated to defendant's residence, and that she and her niece lived in fear of these intrusions for a considerable period of time.
Mrs. Elsa S. Baltar, another friend of defendant's daughter, stated that she was informed of the prowlings in and about defendant's residence; that, in particular, on October 20, 1943, the Wednesday night before the shooting, she went to defendant's home for the purpose of visiting his daughter; that, as she passed on the sidewalk in front of the driveway, she saw what appeared to be a young college student stationed inside the driveway to the rear of the premises; that she was stricken with fear at the sight of the man and that he put his hand to the side of his face and retreated quickly from the premises. She later identified plaintiff's son in the court room as the man she had seen on the night in question.
Defendant states that, due to the repetition of the disturbances occurring in and about his home, his wife and daughter became extremely excitable and nervous; that they lived in a state of constant fear of attack and that his wife's health was so adversely affected by the incidents that she was forced to consult their family physician, Dr. Martin O. Miller, respecting her nervous state of mind. This testimony is fully corroborated by Dr. Miller, defendant's wife, his daughter and other friends and neighbors.
The condition, it appears, became so bad that defendant, in an effort to alleviate the state of his wife's mind, took her on a trip to New York during the Summer of 1943 in the hope that the visitations would stop. However, upon their return, the disturbances immediately began again. After having been advised by the police that the intruder was evidently a sex pervert and that he should obtain a weapon for the protection of his wife and daughter, defendant, during the early part of October 1943, borrowed a pistol from his friend and business associate, Mr. W.R. Baird. In addition, Mrs. Gelpi loaned her pistol to him on the night before the shooting.
Defendant's evidence further shows that, at about 7:30 p.m. on Saturday, October 23, 1943, the night before the shooting, Mrs. Kuntz was lying down in her bedroom listening to the radio; that the flood light in the rear of the property was burning as well as the bridge lamp situated near the bedroom window; that suddenly she was startled by a noise and looking towards the window, she saw the eyes of a man peering in at her; that she screamed in fear and became hysterical and that defendant grabbed the borrowed pistol and fired out of the window. His testimony on this score is corroborated by his wife, his daughter and Mr. Billington, who subsequently became defendant's son-in-law and who was present in the living room of the house at the time of the occurrence. *Page 282 
Defendant testifies that, in view of all of the instances related above, he was in mortal fear that the intruder would at some time do bodily harm to his wife or daughter and that he, therefore, on October 24th, stationed himself in his living room with the lights out and with pistol handy, waiting for the intruder to appear. Shortly after eight o'clock, upon seeing a man walking into the driveway on the grass between the two concrete runways thereof, defendant says that he immediately shouted to the invader "stop where you are"; that the intruder failed to heed his warning but continued on in the direction of the bedroom window and that, believing that the well-being of his wife and daughter was in jeopardy, he fired three shots one of which struck the intruder in the back.
The evidence produced by plaintiff with respect to the occurrence of the shooting is to be found in the testimony of Robert Patterson, the injured young man. He maintains that it was his intention to go to the Prytania Motion Picture Theatre, which is located at the corner of Prytania and Leontine Streets. This route would have been a circuitous one as the young man walked up St. Charles Avenue from his home on Robert Street, past Leontine Street and Jefferson Avenue. Use of either one of those streets would have taken him directly to his destination. However, he explains that, when he was near the corner of St. Charles and Jefferson Avenues, he suddenly decided that he would go to the drug store situated on the corner of Octavia and Prytania Streets in the hope that he might find some of his friends and also to get a refreshing drink. He further declares that, as he was walking out Octavia Street and was passing in front of defendant's residence, he was instantaneously seized with an urge to urinate and, in order to obtain relief, he walked some thirty feet from the sidewalk, through the driveway of defendant's premises, where the defendant fired three shots in rapid succession without previous warning.
[1] If the evidence submitted by the defendant and his witnesses is sufficient to warrant a finding that he, as a reasonably prudent man, had good cause to believe that the intruder entered the property with an intent to do bodily harm to his wife or his daughter, then it matters not whether plaintiff's son trespassed on the premises for the purpose of relieving himself or to "peep" or to commit acts of violence. It is well settled, even in the common law states, that a defendant using force under a reasonable apprehension of danger is not civilly liable to one whom he has cause to believe is his assailant even though it subsequently appears that he is mistaken. In 6 C.J.S. § 18, under the title "Assault and Battery," it is stated at page 812:
"Where a man reasonably expects an attack from A, and in the exercise of due care mistakes 13 for A, and strikes B, he is, nevertheless, excused on the ground of self-defense and apparent necessity."
The following cases are cited in support of the text: Courvoisier v. Raymond, 23 Colo. 113, 47 P. 284; Paxton v. Boyer, 67 Ill. 132, 16 Am. Rep. 615; Crabtree v. Dawson,119 Ky. 148, 83 S.W. 557, 67 L.R.A. 565, 115 Am.St.Rep. 243 and Rook v. Koons, Tex.Civ.App., 289 S.W. 1077; Id., Tex. Com.App., 295 S.W. 592. See also Prosser on Torts, Section 17, pages 114 and 115.
Hence, as aforesaid, it is unimportant that we determine the intent of Patterson although it is apparent, from a consideration of all of the evidence in the case, that the District Judge was not at all impressed with the young man's statement.
We therefore return to a discussion of the evidence submitted by defendant in support of his plea that he was justified in shooting the young man. In view of the decision below, it is manifest to us that the District Judge reached the conclusion that the repeated harassments, intrusions and invasions of defendant's premises by the prowler were sufficient to cause a reasonably prudent man to believe that the invader intended bodily harm to his wife and daughter and that, under the peculiar circumstances of the case, he was warranted in repelling the invasion by use of a deadly weapon.
The complaint of council for plaintiff on this appeal is that the judge was in error in resolving that the shooting was justified. They maintain that defendant's fears for the safety of himself and family have been *Page 283 
greatly exaggerated in his efforts to build up a defense and that the sum and substance of his supposed fears are founded, not upon an actual invasion of his residence, but upon undue excitement caused by mere boyish pranks, i. e., trespassers upon the premises to peep at women disrobing. Pointing to the fact that at no time did the trespasser attempt to break into or enter the house, council say that the alarm of defendant is pretended and that the truth is that defendant was unwarrantedly vexed and brutally and maliciously resorted to the use of a deadly weapon in a spirit of anger and revenge.
In support of this contention, council have submitted for our considerations numerous adjudications throughout the land and quotations from the American Law Institute's Restatement of the Law of Torts, particularly Sections 65, 77 and 79 under the title "Intentional Harms." All of the authorities relied upon by counsel may be said to be based on the general rule to the effect that, in determining whether fault exists on the part of a defendant for injury caused to another, his conduct is to be gauged in comparison with the standard provided for reasonably prudent men and that, in order to do this, the surrounding circumstances and conditions appearing in each particular case must be carefully investigated and considered. Stated in another way, the true test is whether, under the circumstances presented, the actor justifiably and "reasonably believes that the intruder, unless expelled or excluded, is likely to cause death or serious bodily harm to the actor or to a third person whom the actor is privileged to protect." Section 79, Restatement of the Law of Torts.
[2] Of course, resort to the use of a dangerous weapon in order to repel a supposed attack upon a defendant's person or that of persons to whom he owes a duty to protect cannot be countenanced as justifiable save in exceptional cases where the actor's fear of the danger is not only genuine but is founded on facts which would be likely to produce similar emotions in men of reasonable prudence. Thus, in the recent case of Bacas v. Laswell, La. App., 22 So.2d 591, where we had occasion to review much of the prior jurisprudence of this state on the subject, we pointed out that, while recovery in Louisiana will not be permitted in assault and battery cases where the plaintiff is the aggressor and the difficulty was brought about through his exclusive fault, this rule will not be applied where there is mutual fault respecting the difficulty which brings about the injury in cases where the defendant uses undue force (such as a dangerous weapon) not justified by the occasion.
[3] When we apply the law, as we understand it, to the facts of the case at bar, we experience little difficulty in approving the conclusion of the judge below that the defendant was justified in believing that his wife and daughter might be attacked and that he acted as any ordinarily prudent man would act when confronted with a like problem. In the United States, the right of a man to maintain his home free from outside interference and intrusion and to repel invasion therein by the use of force is well-recognized and generally understood. This right has always been a cherished one — one which has been zealously guarded and protected by our basic laws. If these disturbances or attacks, treated so lightly by counsel for plaintiff, had been mere boyish pranks which occasionally occurred on the premises, there might be some room for argument that defendant was not justified in obtaining a pistol for the purpose of repelling the invader. But such was not the case, according to the undisputed evidence. The attacks were incessant and continued for a period of over a year. Defendant and his family became more and more alarmed as the nocturnal disturbances were repeated. Their anguish, we think, was natural. Protective measures, such as the lighting of his driveway, the placing of lamps at windows, summoning the police on numerous occasions, were all resorted to by defendant in vain. As time went on and the intrusions were continued, the security of defendant's home and his family appeared to him to be in serious jeopardy. The nervous strain increased and defendant was advised by police authorities (whether rightly or wrongly is not the question) that the probabilities were that the person or persons responsible for the intrusions would some day attack his wife and daughter. Offers of the use of firearms were made to him by friends, who *Page 284 
had observed the untenable conditions under which the family was living, and finally defendant, apparently at his wits end for protection, took the weapon and used it to repel what he believed to be an attack. Under stress of the circumstances with which defendant was confronted, we cannot say that he was not justified in shooting the intruder because the latter had never attempted to break into the house and was not effecting a felonious assault at the time the shots were fired. Nor do we think that defendant was required to wait until the transgressor exerted force to accomplish his end (which defendant believed was an attack on his womenfolk) in order to be held blameless if the feared invasions were of such a nature to impress an ordinarily prudent man that the attack would ultimately occur.
This is an unfortunate tragedy and we sympathize with the young man who unquestionably suffered a severe injury and endured much pain and mental anguish. But our law (Article 2315
of the Civil Code) does not authorize a recovery against one who cannot be adjudged guilty of fault under the legal standards of human conduct by which blame is determined.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.