JANVIER, Judge!
At 4:15 o’clock on the morning of October 12, 1953, Wayne R. Smith, a fourteen year old newspaper delivery boy, was shot and very seriously and permanently injured by Edward J. Delery at whose residence young Smith, a short time before, had delivered a morning newspaper and whose defense to this damage suit is based on the contention that, because of repeated appearances of prowlers in' the neighborhood and because he thought that young Smith, who had gone to the rear of his premises to retrieve his dog, was a prowler and that the safety of himself and the members of his family might be endangered, he was justified in discharging the pistol which unfortunately struck the boy.
The suit is brought by William N. Smith, the father of the boy who; on his own behalf, prays for $9,518.69 as the amount expended, or to be expended, by him for medical services, hospital care, etc., and $156,570 for the use and benefit of the minor.
St. Paul Mercury Ins. Company, the compensation insurance carrier for the newspaper for which young Smith worked, intervened, alleging that the boy’s employment was within the purview of the Workmen’s Compensation Statute and that the injuries were sustained during the course of and arose out of the employment and had. disabled him from performing his duties. Intervenor alleged that it has made compensation payments and is currently making additional payments and, as subrogee, prayed for judgment against defendant for the aggregate amount of its compensation liability, together with interest and a reason-, able attorney’s fee.
From a judgment dismissing the suit and the intervention both plaintiff and in-tervenor have appealed.
There are very few disputed questions of fact. However, the question of whether Delery should be held liable seems to us to depend almost entirely upon a determina *900 tion of one faict which is in dispute1, that is, whether young Smith, at the time at which the shot was fired — regardless of what may have been his purpose in going to the rear of the Delery residence — had turned and was obviously going away from the residence, or had dashed or dived into the shrubbery which was alongside the residence and partially under the window from which the shot was fired.
It cannot be disputed that the record abundantly indicates that, for quite sometime, most of the families in the neighborhood had been exceedingly alarmed by the actual appearance of prowlers and by repeated rumors of such appearances. Though there is testimony of certain neighbors to the effect that they knew little of such prowlers or rumors, there is testimony of other neighbors to the effect that they had all become alarmed and that on several occasions they had joined together in making a search for prowlers and in attempting to determine just how such prowlers might be apprehended or prevented from continuing their actions.
Young Smith, in making his paper deliveries, rode a bicycle and was accompanied by his dog, Taffy. The boy says that, having delivered many of his papers and while passing the Delery residence on the other side of the street, he heard the barking of other dogs which seemed to- be somewhere in the rear of the Delery residence, and that his dog, a gregarious animal, ran across the street and into the driveway which was alongside the residence and that he, in an. effort to prevent the dog from "waking up’ the neighborhood” got off his bicycle and went to the rear to retrieve the dog which had entered certain shrubbery alongside and near the rear of the Delery residence. This was not the shrubbery to which we shall later refer and which we have already stated was partially under the bedroom window.
The driveway along which the dog had gone and along which the boy went to retrieve it was not a part of the Delery property but led to the garage of the next door neighbor, Berthelot. However, there was no fence or other marker separating the Berthelot and the Delery properties.
The boy says that, having retrieved his dog from the shrubbery near the rear of the house, he held it by the “fur” on the back of the neck since it had no collar or leash and, having turned and gone a short distance towards the front of the residence the dog started to pull back and that he stopped and stooped over the dog in an effort to secure a firm hold and that at that time his back was towards the bedroom window in the Delery house. He says that, while he was in that position, he heard someone call out, “halt there boy,” and that almost instantly the shot was fired. He was struck in the back just above the waistline and about one inch on the right side of the spinal column. The bullet passed completely through his body making its exit apparently an inch or two to the left of the navel and a little higher up than the spot at which it had entered at the back of the boy. It passed through one kidney, with the result that subsequently that kidney and the spleen were removed.
Delery says that on the morning in question, already tremendously alarmed by the numerous appearances of prowlers, he was awakened by his wife who., having already arisen, nudged him to awaken him since she was in such a state of panic that she could not speak. He says that she pointed several times towards the window of the bedroom and that looking out he saw the "silhouette” of a person approaching his window; that he could not tell whether it was a man or a woman o.r a boy and that, having secured his .38 caliber revolver, and after ordering the person to halt or stop, he fired a shot which struck the boy as he turned sideways and dove towards the bushes by his window.
Mrs. Delery corroborates his statements and says that, having awakened to prepare a bottle for the baby, she heard rustling of leaves at the children’s window; that *901 she then went to the bedroom window and looked out and “she saw someone coming from the back alley.” She adds that she then heard rustling and a little later heard much more rustling and that she was so frightened that she could not speak and then awakened her husband by touching his foot.
We now especially direct attention to the really important question which is in dispute, and we first point to certain statements of Delery on which counsel for plaintiff and for the interveno-r rely in their efforts to convince us that when he fired, Delery was no longer in fear of the safety of himself or his family since, according to his own testimony, the perso-n whom he saw was not coming towards the residence but was going away from it. It is true that Delery did say that, at the time at which he fired the pistol, “the person ran away.” He had been asked whether the person “ran away from your window,” and he answered: “They ran on a diagonal and through my bush which is farther front than my window,” and a little later he was asked whether it was true that when he fired that “person * * * was no longer coming to your window,” and he answered: “No-, he wasn’t.”
Counsel also point to Delery’s statement that when he fired the shot he did no-t intend to hurt the person, but that he “shot to scare.” He says that he “hollowed ‘halt’ and the person ran, I figured I was going to shoot to scare whoever it was so they would not come bade.”
It seems to be practically conceded by counsel for plaintiff and for intervenar that, as we held in Patterson v. Kuntz, La.App., 28 So.2d 278, 283, where a husband and father, under extraordinary circumstances, is justified in bdieving that the safety of himself or members of his family may depend upon the use of firearms, he is not liable for damages resulting therefrom, provided his action is such as would have been expected from a reasonably prudent person. However rarely they occur, there may be. situations in which a person, being in justifiable fear of his own safety or of the' safety of his family, may shoot and injure someone who is apparently about to- attempt to break into the home or to harm someone therein. It is, of course, conceded that this is true only in exceptional cases where,' as we said in the Patterson case, “the actor’s fear of danger is not only genuine but is founded on facts which would be likely to-produce similar emotions in men of reasonable prudence.”
Since extreme fear of great danger must exist if such a defendant is to escape liability, it would follow that if Delery did not fire until the boy had turned and was actually going away from the residence, the' imminent danger no longer existed and there would be liability in Delery. Therefore it is essential that there be a clear understanding of exactly what Delery meant when he said that the “perso-n”’ was not coming towards the window. His explanation of what he meant cannot be clear without an understanding of the location of the residence with reference to the shrubbery and the two paved strips of the automobile driveway and the relative distances which are involved.
It must be understood that there are two different clumps oif shrubbery alongside the Delery residence. One clump o-f canes is near the rear and it was from these that the boy had retrieved his dog. The other clump o-f shrubbery is not canes, but consists of a number of leafy bushes and is located close against the side of the house and, according to the sketch and the photographs, is partly under the window and extends towards the front of the house a few feet. It extends from the house out towards the paved driveway about three o-r four feet. The driveway consists of two paved strips, the nearest o-f which is five feet, seven inches from the side of the residence, and between the residence and this first strip and between the two strips there is grass.
*902 After Delery had stated that though the “silhouette”, when he first saw it, was “approaching my window” and had very frankly said that, when he shot, the “silhouette” was no longer coming towards the window, and after counsel for plaintiff and inter-venor had suggested that what he meant was that the person “was running away”, he said:
“You are trying to give the impression that he was running completely away from the place when I fired, which is incorrect. The person dove to the side of the window which was away from the window and I fired then.”
And when questioned' further as to whether the person in question was running away from the window to the side, he answered: “He dove from right there onto the side by the window.”
When we realize that the shrubbery was partially under the window and that it would have provided the best possible place for hiding for a person bent on mischief or with some more serious intent, and that a person hiding in that shrubbery would have been out of the range of vision of anyone looking through the window, we at once understand that if what Delery says is true, then though the “person” did not come towards him, he apparently intended to place himself in a position of vantage for some future attempt to break into the house.
Thus the all important question is whether the boy, at the time, was obviously going away from the residence or was apparently attempting to conceal himself in the shrubbery almost under the window. The boy says that he did not dive into the bushes or even move towards them.
Other evidence throws little light on the question of just where the boy was when he was struck by the bullet. One neighbor, Henry D. Bacon, the first to arrive, says that he was already dressed and that therefore, as soon as he heard the shot fired, he went out and reached the spot within about twenty seconds. He says too that when he arrived the boy “was lying on the ground in Mr. Delery’s yard. He then added that the boy was “lying on the grass and he started rolling over and over sideways and he rolled over to the first course * * * ”.
If he was lying on the grass and rolled over and over to the first strip of paving referred to as the “course”, he must have been very near to the house when he started rolling since the first strip of paving, as already shown, is only five feet, seven inches from the house and only two or three feet from the outer edge of the shrubbery.
Another neighbor, Robert E. Turner, says that he arrived at the scene one or two minutes after Bacon and that the boy was lying in the driveway.
Officer Buceóla, a Trooper of the Louisiana State Police, says that when he arrived the boy “was lying on the sidewalk.”
Mrs. Barbara D. Oldstein, a neighbor who is a registered nurse, “heard a lot of commotion outside,” and immediately went over and found the boy “lying on the grass * * * right along the driveway.”
From this and other evidence it cannot be determined with any certainty just where the boy was when the shot was fired, but it definitely creates the impression that he must have been very close indeed to the shrubbery which was so close to the house and so close to the window.
An examination of the photograph of the window itself shows that the bullet hole in the screen was only about five or possibly six inches from the bottom of the window and not more than twelve inches from the right side. This would seem to indicate that the bullet was not fired in a direct line into the driveway but low and to the right and towards the shrubbery which Delery says the boy dove into.
While the boy says that, at no time did he cross the line between the two strips and go upon the Delery property, at another point in his testimony, when asked: “What *903 were you doing with the dog ?” he answered: “Taking him out of the shrubbery,” meaning the reed cane shrubbery which was very close to the Delery residence and definitely on the Delery property.
There is some evidence to the effect that the boy admitted that, when he went to the rear of the residence, he looked into the window. This evidence does not convince us that the boy had engaged in any such practice.
The record convinces us that the boy had done nothing more than attempt to prevent his dog from joining in the barking and that, in perfect good faith, he had done all that he could to retrieve it from somewhere near the rear of the residence.
However, liability vel non of Delery does not depend upon whether young Smith looked through the window but rather upon the question of whether or not Delery, under all the circumstances, acted as a man of reasonable prudence would have acted. We think that he did.
It is impossible to express our regret that the young man seems to have been the innocent victim of a chain of circumstances for which he was not to blame.
When we compare the facts of this case with those found in Patterson v. Kuntz, supra, [28 So.2d 282] it seems that, except for the fact that young Patterson was to some extent himself to blame, there is no distinction between the facts here and the facts there. There the previous occurrences, together with the presence of the young man and his approach towards the Kuntz residence, were held sufficient to justify the action of Kuntz in firing the shots. In that case we found that the intruder failed “to heed [the] warning [to stop],” but continued on in the direction of the bedroom window. Here, though young Smith did not continue in the open towards the window, nevertheless he continued towards a hiding place immediately alongside the house and put himself in a position in which, had he been an intruder with felonious intent, he would have constituted just as great a threat as he would have constituted had he continued directly towards the window.
Young Smith was permanently and most seriously injured and it is regrettable that he is not entitled to recover more than the meager amount recovered in compensation. But since we feel that Delery was not legally at fault, we find it necessary to affirm the judgment in his favor.
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.