FOURNET, Chief Justice.
 

 We granted certiorari in this case on the applications of the plaintiff, William N. Smith, and the intervenor, St. Paul Mercury Indemnity Company,
 
 [1]
 
 to review the judgment of the Court of Appeal, Parish of Orleans, affirming the judgment of the district court dismissing the suit plaintiff had filed to recover damages,
 
 [2]
 
 individually, and on behalf of his minor son, Wayne R. Smith, who sustained severe and permanent injuries as a result of having been shot and wounded by the defendant, Edward L. Delery; and also dismissing the intervention.
 
 [3]
 

 The record discloses that the minor, Wayne R. Smith, a 14 year old newspaper boy, was delivering the Times-Picayune at about 4:30 in the morning of October 12, 1953, along his regular route in the Metairie section of Jefferson Parish, riding his bicycle and accompanied by his dog. The boy testified that he had already delivered the paper to the defendant, one of the sub
 
 *183
 
 scribers, and was making deliveries on the opposite side of the street, when his dog, attracted by the barking of other dogs, ran in the back of defendant’s premises; that after parking his bicycle opposite from a driveway (which runs parallel and within five feet from the side of defendant’s house), he walked across the street, retrieved his dog from the bushes in the rear of defendant’s residence and was starting back towards the front of the house, when the dog tried to pull away (the dog apparently got away from him a couple of times) ; that he stopped and stooped over the dog to get a firm hold on its fur (the dog having no collar) when he was ordered by the defendant to halt,
 
 [4]
 
 which warning was followed within a fraction of a second by a shot, the bullet entering the boy’s back right of the center and leaving his body about 3 to 3i/¿ inches in the front below the left armpit, penetrating one of his kidneys which, together with the spleen, had to be removed.
 

 Defendant admits the shooting, but seeks to avoid liability on the ground that the minor’s action led him to believe that he was a prowler or intruder, intending to harm either himself or his family, and that in view of his apprehension and fear, brought upon by the frequent appearances of prowlers, peeping, toms and intruders on his premises and in the immediate neighborhood, he acted as a reasonable and prudent man in light of the surrounding circumstances.
 

 The Court of Appeal, in a well-considered opinion, observed: “There are very few disputed questions of fact. However, the question of whether Delery should be held liable seems to us to depend almost entirely upon a determination of one fact which is. in dispute, that is, whether young Smith, at the time at which the shot was fired- — regardless of what may have been his purpose in going to the rear of the Delery residence- — had turned and was obviously going away from the residence, or had dashed- or dived into the shrubbery which was alongside the residence and partially under the window from which the shot was fired.” And, after carefully reviewing and analyzing the pertinent evidence, concluded that “The record convinces us that the boy had done nothing more than attempt to prevent his dog from joining in the barking and that, in perfect good faith, he had done all that he could to retrieve it from somewhere near the rear of the residence. However, liability vel non of Delery does
 
 not depend
 
 upon whether young Smith looked through the window but rather upon the question of whether or not Delery, un
 
 *185
 
 der all the circumstances, acted as a man of reasonable prudence would have acted. We think that he did.”
 

 In reaching this conclusion, the Court of Appeal, relying on its prior holding in the case of Patterson v. Kuntz, La.App., 28 So. 2d 278, stated: “When we compare the facts of this case with those found in Patterson v. Kuntz, supra, [28 So.2d 282] it seems that, except for the fact that young Patterson was to some extent himself to blame, there is no distinction between the facts here and the facts there. There the previous occurrences, together with the presence of the young men and his approach towards the Kuntz residence, were held sufficient to justify the action of Kuntz in firing the shots. In that case we found that the intruder failed ‘to heed [the] warning [to stop],’ but continued on in the direction of the bedroom window. Here, though young Smith did not continue in the open towards the window, nevertheless he continued towards a hiding place immediately alongside the house and put himself in a position in which, had he been an intruder with felonious intent, he would have constituted just as great a threat as he would have constituted had he continued directly towards the window.”
 

 Plaintiff and intervenor concede that the rule announced in Patterson v. Kuntz, supra, i. e., that “resort to the use of a dangerous weapon in order to repel a supposed attack upon a defendant’s person or that of persons to whom he owes a duty to protect cannot be countenanced as justifiable save in exceptional cases where the actor’s fear of the danger is not only genuine but is founded on facts which would be likely to-produce similar emotions in men of reasonable prudence,” is correct, but argue that it is inapposite from a factual standpoint.
 

 The record unmistakably shows that the actual appearance of prowlers, peeping toms and intruders and repeated rumors of such appearances, extending over a period of more than one year, had created a general fear and apprehension among defendant and his neighbors, which was probably heightened by the fact that most of the men (except the defendant) held travelling jobs, and during their frequent absences their young wives and minor children looked mainly to the defendant for protection; that on several occasions the. men had joined in patrolling the neighborhood in an effort to detect and apprehend a prowler; that various complaints were filed with the police, who — in response to those complaints— likewise searched the neighborhood for any intruders; that the landlord owning the apartment building fronting on the back of defendant’s house had been asked to install a floodlight, but refused to do so, whereupon defendant illuminated his rear yard and driveway to discourage any prowlers; that on at least two occasions various neighbors detected a prowler and chased
 
 *187
 
 him, the last of these incidents occurring ■only three days prior to the shooting.
 

 We think that in view of the general state of apprehension and fear prevailing at the time and the specific occurrences taking place immediately before the shooting, which will be discussed in detail later herein, the trial judge and the Court of Appeal were correct in finding that defendant had acted as a reasonable and prudent man in the belief that he and his family were in immediate danger.
 

 With respect to the incidents preceding the shooting, defendant’s wife testified that, awakened by her infant daughter’s crying at about 4:13 in the morning, she had gone to the kitchen to heat some milk, when the howling of her neighbor’s dog startled her; that she turned off the kitchen light, “peeped out of the kitchen window” and the livingroom window, without being able to see anyone; that after giving the bottle of milk to her child, she went back to bed and was just about to lie down, when again she “heard this terrific rustling at the children’s window,” and upon getting up and looking through her bedroom window she saw someone coming from the back of her house, down the neighbor’s driveway towards the street; that the person had already passed out of her line of vision, when again she heard the bushes rustle at her children’s bedroom window, whereupon she tried to arouse her husband, who, being a heavy sleeper, would not respond until she finally nudged him, and, being so terrified and frightened by the continuing rustling that she was unable to speak, she “jumped into the corner” of the bedroom, pointing towards the window in an effort to direct her husband’s attention to the prowler. She further testified that her husband arose, got his pistol and fired a shot after having warned the person to stop.
 

 Defendant testified that when he was awakened by his wife he saw her standing in the corner of the bedroom, pointing to^ wards the window, but too terrified to speak; that he heard a rustling in the bushes and a noise from the children’s bedroom sounding as if someone was trying to cut the screen; that he armed himself with a pistol and was going towards the children’s bedroom when, suddenly, the noise appeared to come from his bedroom window; that he saw a “silhouette” advancing from the back of the house around the bushes towards his window, whereupon he shouted a warning and the person “just sort of hesitated” and then “took off” and “ran on a diagonal and through my bush, which is further front than my window;” that in the belief that “someone was trying to harm my [his] children in view of what had happened in the neighborhood prior to that,” he levelled his gun and shot in the direction the person was moving; that he was extremely upset and did not hear a single sound from outside, until after a few
 
 *189
 
 moments he heard someone call for help and, upon investigating, found the plaintiff’s son lying in the yard.
 

 While the evidence throws little light on the question of just where the hoy was when he was hit by the bullet, we think that judging from the point where he was found lying on the ground and according to his own testimony he must have been very close to the shrubs under the defendant’s bedroom window, for he testified that after having been shot he staggered and fell forward and diagonally away from the defendant’s residence for a distance of 10-12 feet. Furthermore, in view of the boy’s testimony that immediately prior to the shooting he stooped over in an effort to secure a firm grip on the dog’s fur, it may be reasonably assumed that to the defendant, watching from the window, the boy’s sudden movement in so stooping over appeared as if he were running or diving diagonally into the bushes, from which position — had the boy in fact been an intruder with felonious intent ■ — -he would have constituted a potential and immediate danger.
 

 While we deplore this tragic incident, which left plaintiff’s son with a serious and permanent disability, we are nevertheless in accord with the views expressed by the trial judge and the Court of Appeal that this young man, although [98 So.2d 903] “the innocent victim of a chain of circumstances for which he was not to blame,” is not entitled to recover more than the meager amount recovered in compensation.
 

 For the reasons assigned, the judgment of the Court of Appeal is reinstated and made the final judgment of this Court.
 

 PONDER, J., dissents.
 

 [1]
 

 . The intervenor, workmen’s compensation insurer of the Times-Picayune Publishing Co., seeks to recover the aggregate amount of compensation benefits paid, together with legal interest, a reasonable attorney's fee and cost.
 

 [2]
 

 . Plaintiff, individually, is seeking to recover damages in the amount of $9,518.-69, consisting of medical expenses paid and to be paid, lost wages of the minor until his 21st birthday, and various other expenses connected with the minor’s illness; and damages in the amount of $156,570 for the use and benefit of the minor for personal injuries, pain and suffering, permanent loss of kidney and spleen, and loss of future earnings.
 

 [3]
 

 .Smith v. Delery, La.App., 98 So.2d 899.
 

 [4]
 

 . The boy testified that defendant shouted “Halt there, boy,” “Halt, boy,” or “words to that effect.” Defendant, on the other hand, testified that not knowing whether the “silhouette” was a man or boy, he ordered the alleged trespasser to “halt” or “stop.”