159 So.2d 700 (1964)
Marvin W. McKELLAR, Sr., Individually and for Michael McKellar,
v.
Wallace H. MASON and Lumbermen's Mutual Casualty Company.
No. 1178.
Court of Appeal of Louisiana, Fourth Circuit.
January 6, 1964.
Rehearing Denied February 3, 1964.
Steven R. Plotkin and H. Charles Korn, New Orleans, for plaintiff-appellant.
Sam Monk Zelden and Max Zelden, New Orleans, for Wallace H. Mason, defendant-appellee.
Hammett, Leake & Hammett, H. L. Hammett, New Orleans, for Lumbermen's Mutual Casualty Co., defendant-appellee.
Before REGAN, SAMUEL and TURNER, JJ.
HENRY F. TURNER, Judge pro tem.
This suit in tort for personal injuries and related items of damage was filed by the plaintiff for himself and for the use and benefit of his minor son who was shot by the defendant, Mason. The defendants are Mason and his liability insurer. Both defendants deny liability on the grounds that the shooting was accidental and in self defense. The insurer also denies liability on the additional grounds that Mason's act in shooting was excluded under the provisions of its policy. There was judgment in the trial court in favor of the defendants *701 dismissing plaintiff's suit. Plaintiff has appealed.
At the time the incident occurred, Michael McKellar was 14 years of age and more than 5 feet 6 inches in height. He and his friend, Leo Schnell, one year younger and about the same height, had scaled a fence at the rear of Mason's property on Saturday, March 30, 1957, and stolen four or more homing pigeons from a coop in the back yard. The following Sunday, March 31, 1957, shortly before 7:15 p. m., a dark, rainy night, the two boys, both wearing dark raincoats, attempted to steal more of Mason's pigeons. Mason fired a 20 gauge shotgun three times from a second floor window of his home. Young Schnell was struck by No. 6 shot. He climbed the fence and left. McKellar was struck in the back by 00 buckshot. His injuries are so serious that he will be a paraplegic for the remainder of his life. The other shot struck a neighbor's garage on the neighbor's side of the rear fence.
After the shooting Mason telephoned the police. They advised him not to go into the yard. A patrolman, Charles Bird, and his partner arrived on the scene shortly thereafter. Bird received the call on the police radio at about 7:15 p. m. and was at the scene five minutes later. Drawing his gun and going into the yard to investigate, he found the McKellar boy lying on the ground approximately 4 feet from the rear of the back fence, 4 feet from the pigeon coop and 30 feet from the house. The boy was taken to a hospital in a police crash truck and Mason gave Bird a 20 gauge semi-automatic Remington shotgun and three empty cartridges, the gun and cartridges Mason had used in the shooting.
A detailed description of the premises involved becomes important. Mason, aged 64 at the time of the incident, and his wife, also in her 60's, lived in a two-story double house at 1711 Pauline Street in the City of New Orleans. The house contained a basement garage opening on Pauline Street and five-room living quarters on the second floor. The other half of the double was exactly the same and both upper residences could be reached by means of one set of steps in the center front. In addition to the garage doors on Pauline Street there were two other doors on the basement level of Mason's half of the house. One was at the back and the other was in the center of the side of the house. Inside the basement itself there was one set of stairs leading to the living quarters. At the top of these stairs was a door closing off the living quarters from the basement. The house was approximately 50 feet wide and 70 feet long, and there was a side yard 120 feet in depth. The width of the side yard was approximately 50 feet.
Mr. Mason raised racing homing pigeons as a hobby. He customarily kept a flock of between 35 and 40 birds, which he testified had a value of from $20.00 to $250.00 each. To house these pigeons he had built a metal coop with a trap door on the top and an entrance door on the right side facing the house. The pigeon coop was about 16 feet long, 10 feet wide and 7 feet high. It was located diagonally away from the house in the far rear corner of the back yard close to the rear and side fences. The yard was enclosed by a wire mesh fence, commonly referred to as a "Page" fence, 7 feet in height on the rear line, that part of the fence the boys had scaled in entering the yard, and 4 feet in height on the side lines.
The two boys testified that they had stolen several pigeons the previous night and on the night of the shooting had climbed the back fence and entered the yard for the purpose of stealing more pigeons. According to their testimony, they decided to leave when they saw that the pigeon coop was locked. They were several feet from the back fence going towards it when Schnell was struck by one of the shots, the first. McKellar was two or three steps behind Schnell, and he was hit by the buckshot. Both boys testified they did not hear anyone "hollow" to them before the shots were fired.
*702 Mason testified as follows: He did not know that any of his pigeons had been stolen on the previous Saturday night. On the night of the shooting he and his wife were in the front room watching television. He went to the rear of his home to close windows when it began to rain hard. After he had closed the back window of the rear room, a bedroom, he proceeded to close a side window in that room. In doing so he saw three figures with raincoats and slicker hats walking shoulder to shoulder coming from the back of the yard. He became frightened and got his gun, the shotgun, which he kept in the corner of the bedroom. It had been loaded since the close of the deer hunting season approximately three months previously. The three shotgun cartridges with which the gun was loaded were marked No. 6, but at least one was loaded with 00 buckshot (actually there appears to be little or no question that two of the shells were loaded with buckshot). During or before the deer season, he had reloaded several of the cartridges containing No. 6 shot with 00 buckshot. He called to the men to halt when they were at the pigeon house. They disappeared from his view, and he thought they were running towards the house. He was frightened for the life and the safety of his wife and himself because the basement doors were open and one of those doors was only 18 feet from the pigeon coop. He thought the men entered the house through a basement door. He fired three shots into the ground without intending to hit anyone. On two or three previous occasions some of his pigeons had been stolen. For the purpose of emphasis, we quote the testimony in which he stresses his fear:
"I became so frightened when I called them to halt and I didn't see them halt, I saw them disappear, I thought they were coming to my home, my basement doors were open, I was terribly frightened for the life of my wife and myself, I wasn't worried about my property. I didn't know what they were going to do to us so I called them to halt, when they didn't halt and disappeared I didn't know where they were. I started to shoot, they looked like they come this way and I shot that way, I didn't want to hit anybody."
While it is true that Mason made several statements which are contradictory in some respects, when the case is boiled down to what actually took place, we reach the conclusion that in the excitement of finding two or possibly three culprits in the act of committing a felony, that Mason's act in shooting the two thieves, while not completely justified, is excusable, bearing in mind that Mason at the time of the shooting was 64 years old, living with his wife who was in her 60's and was naturally concerned over their personal and physical safety. Mason had read in the daily newspapers, as we all do, of the occurrence of brutal physical assaults on elderly people, and while the action he took was harsh, we are not prepared to say that he exceeded his rights in protecting his domain. The Constitutions of the United States and Louisiana give us the right to keep and bear arms. It follows, logically, that to keep and bear arms gives us the right to use the arms for the intended purpose for which they were manufactured.
We must consider the fact that the situation was brought about entirely by the two young thieves. We also must consider the ages of Mr. and Mrs. Mason when we use the yardstick of the reasonable man of 64 years of age to measure both Mason's emotions and prudence under all of the circumstances disclosed by the record herein, especially the fact that alone with his wife, on a dark, rainy night, he had cause to believe that these were men who may turn out to be assailants of his wife and himself, moving toward him, although it subsequently turned out that he was mistaken in his evaluation of the situation, which was probably due to his genuine apprehension and fear of impending danger.
*703 We don't think the record supports Mason's statement that there was an additional person other than Michael McKellar and the Schnell boy. It is impossible to look into one's mind and tell what he is thinking or what mental reflexes are taking place. We feel, however, that the act of Mason, considering the history of the previous invasions of his property would have justified him in feeling apprehensive for the physical safety of himself and his wife, in taking the harsh action he did resulting in the unfortunate and regrettable maiming of the young McKellar.
Mason testified that he called to the intruders to stop or halt and in the excitement was unable to ascertain in which direction they were going. It was entirely possible that, even if they were attempting to leave the premises, they could have turned and opened fire, or realizing that they had been apprehended would, as is often the custom of a "cornered" person, fight their way out.
We feel, as did the Trial Court, that it would seriously hamper and curtail the citizens in their right to peacefully enjoy all their property to set a precedent by holding that under such circumstances as we find in this case that the occupant of the premises and dwelling must, at his civil peril, investigate first and shoot afterwards instead of shooting first and investigating afterwards, a practice which would usually prove to be disastrous when a citizen was suddenly confronted by thieves or felons.
It may just be coincidental that at the exact moment that the two young thieves were attempting to leave the premises that Mason saw and shot them. We are inclined to believe Mason's statement that he first ordered the culprits to stop or halt and on their failure to do so, and under the mental emotion brought about by the existing dangerous situation, he fired the disastrous shots. Mason had lost some of his valuable pigeons on previous occasions and on this occasion he had no way of knowing whether or not the culprits had some of his pigeons in their possession. Certainly the fact that he had locked his coop could not eliminate the possibility of thieves bent on taking the pigeons would use wireclippers or some other instrument to cut the wire or break the lock. Our Code of Criminal Procedure, LSA-R.S. 15:61, gives any private person the right to make an arrest when a felony is committed in their presence. LSA-R.S. 15:64 provides: "Everyone must submit peaceably to a lawful arrest, and, if he resists, any person lawfully arresting him may use such force as may be necessary to overcome the resistance."
The courts have had occasion to consider cases similar to this on at least four occasions: Edwards v. Great American Insurance Co., La.App., 146 So.2d 260; Wilson v. Dimitri, La.App., 138 So.2d 618; Smith v. Delery, La.App., 98 So.2d 899 and 238 La. 180, 114 So.2d 857; Patterson v. Kuntz, La.App., 28 So.2d 278, 283. In each of those cases, recovery was denied the plaintiff. We are not unmindful of the fact that the circumstances in those cases justified the defendants in each case in taking the extreme action which resulted in serious injuries in each case. We recognize that the facts in this case are somewhat less favorable to the defendant than in the cited cases. It is only a matter of degree, and the legal principles involved are nonetheless the same.
In determining what is reasonable conduct, there is no fixed rule. The special facts and environmental characteristics of each case must be considered and treated individually in conformity with the essential civilian judicial technique. Judicially, we are tending more and more toward an appreciation of the truth that in the last analysis there are few absolute rules; there are principally standards and degrees of negligence for the reason that no judge is so gifted with foresight that he can anticipate every possible factual event and prescribe the proper rule for each.
*704 In the Patterson case, the Court reasoned thusly:
"A defendant using force under a reasonable apprehension of danger is not civilly liable to one whom he has cause to believe is his assailant, even though it subsequently appears that he is mistaken.
"The use of a dangerous weapon in order to repel a supposed attack upon defendant's person or that of persons to whom he owes the duty to protect cannot be countenanced as justifiable save where actor's fear of the danger is not only genuine, but is founded on facts which would be likely to produce similar emotions in men of reasonable prudence."
We are in full accord with the foregoing rationale insofar as it applied to the special facts appearing in Patterson v. Kuntz, supra, and other cases of a similar nature; however, in the alternative, we are of the opinion that the foregoing rule should be re-examined and its rationality extended more realistically to encompass some of the very unusual facts developed herein.
In other words, in each of the foregoing cases, the author of the opinion always emphasized the fact that the defendant therein related that he was in reasonable fear of bodily harm or he was reasonably fearful of bodily harm occuring to some member of his family. This, of course, frequently, as we have said hereinabove, is unrealistic for the reason that men frequently have repelled attacks under factual situations such as appear in the foregoing cases without fear or apprehension of danger being their primary emotional manifestation. And likewise in those cases, the inference is obvious that the defendants had been the beneficiaries of excellent legal advice prior to making any admissions which could be construed to be prejudicial in view of the rationale emanating from the foregoing cases.
In other words, the doctrine of stare decisis, that is, the case being the philosophical key to the solution of all problems, has no application in Louisiana where it is employed not in its historical function of re-examining a question once decided, but merely as an additional argument available equally to the majority of the Court which feels a former decision is correct, or to a dissenting or concurring judge protesting to the overruling of a decision which he believes to be sound. In Louisiana the doctrine of stare decisis, conceived as such, is a myth. Case law in our jurisprudence has never been anything more than law de facto and has never indicated the slightest trend of becoming law de jure. Therefore, the Supreme Court and appellate courts of this state show every disposition to follow the essential civilian judicial technique of never letting today become the slave of yesterday or the tyrant of tomorrow.
A careful examination of the jurisprudence will reveal that the Supreme Court of Louisiana overruled more cases during the past quarter of a century than it did during the first hundred years of its existence. Thus, in Louisiana, the doctrine of stare decisis has been more honored in the breach than in the observance.
In the final analysis, our judicial civilization is fundamentally a search for more complete efficiency unencumbered by unrealistic proof emanating from similar defendants who have obviously been coached so that their statements, to a large extent, will fall within the very general rationale laid down by the many cases referred to hereinabove.
In the last analysis, the final cause of law is the welfare of the public and an individual's right must recede in favor of the paramount right of the general public; any rule which misses this aim cannot permanently justify its existence.
A man's home has traditionally been his castle, and he who enters therein with felonious intent does so at his peril.
The District Judge heard the witnesses, weighed the evidence and in the *705 penultimate paragraph of his reasons for judgment stated: "This court cannot say that defendant's reaction under the circumstances was not that of a prudent man." After a careful consideration of the entire record and a review of the four cases above cited, we conclude that the judgment of the lower court was correct and is, therefore, affirmed.
Affirmed.
SAMUEL, J., dissents with written reasons.
SAMUEL, Judge (dissenting).
I am of the opinion that there is liability on the part of the defendant Mason.
On three occasions, immediately after the shooting, approximately one hour and fifteen minutes later, and approximately two or three weeks thereafter, Mason made statements (on the second occasion the statement was reduced to writing and signed by him) to three different witnesses, all of which statements differ from his testimony on material facts, which facts establish liability and are demonstratably true as contained in the statements and false as contained in the testimony.
The statement immediately after the shooting was made to Patrolman Bird, the investigating officer, who testified that Mason told him "they" had been stealing his pigeons the night before and he was aware of the fact that they might come back again; he saw three subjects in the back of his yard and hollered "stop" to them; they started running away toward the back fence; he knew they were after the pigeons and fired three shots.
Bird took Mason to the 5th district police station where the latter made the second statement to Lieutenant Albert R. Moustier, who typed the same from Mason's dictation. Mason signed that statement and at the trial of this case admitted he had made and signed the same voluntarily. The signed statement was introduced in evidence. It reads as follows:
"I would state that at about 7:00 P.M. this date Sunday March 31st 1957 I was sitting in my front room looking at TV when I was thinking of being robbed of six of my pigeons last night and I got up and walked to the rear room of my house which is a two story house and I looked thru the window in the rear room and I saw three men wearing rain coats and they were trying to get in the cage with my pigeons and I then went and got my shot gun a 20 gauge automatic Remington make and I went to the window again and I hollowed at them and they started to run then I pointed the gun in their direction as I could not see them very well then and I fired three shots at them one shot while they were near the cage then two more when they were trying to jump over the fence then I went to the phone and called the police.
"After I called the police one of the neighbors Mrs Troyani called me on the phone and told me that she heard some one moaning in my back yard and when the police arrived I learned that I had shot one of the prowlers.
"About two years ago I was robbed of about thirty five of my pigeons which I made a report to the Fifth District about and I have been on the lookout ever since for any one trying to steal my birds.
"I would further state that the three empty shells from my gun which I fired at these men were Western Super X #6 Gauge from a 20 gauge gun, however, one of the shells could have been loaded with buck shot as I have changed #6 shot to buck shot in #6 shells before."
Two or three weeks after the shooting Mason was visited at his residence by James H. Pfister, a special investigator from the district attorney's office. Pfister took various *706 measurements at the scene of the shooting. He made notes of the measurements and of a conversation he had with Mason just before he left. Two or three days later he substantially reduced that conversation to writing and drew a diagram based on his notes. This witness testified that Mason told him: Some boys stole his pigeons on Saturday. The birds flew back on Sunday and when they returned he put a lock on the door of the coop because he thought the thieves might come back. The following evening he was watching television and got up two or three times to observe the coop in the event they should return. According to Pfister, Mason said he was "laying for them" and one of the boys was going over the fence when he shot him.
In fairness, I must say that the statement to Pfister is not as reliable as the previous two. It appears to be the result of more or less casual conversation only parts of which are recalled by Pfister.
On cross examination, when confronted with his signed statement, Mason admitted that before the shooting took place on Sunday he did know some of his pigeons had been stolen the previous night. His testimony on direct examination was that he did not know of the theft; in his statements he said that he did know.
It is so highly improbable as to be practically impossible, and here it is necessary to deal in probabilities, that Mason, whom the record reveals was an experienced hunter, would have intended to fire the three shots into the ground, as he testified, and yet have one of those shots, the one loaded with No. 6 pellets, hit one of the boys, Schnell, and another of those shots, the 00 buckshot, hit McKellar. On a dark, rainy night hitting two targets with three shots would constitute effective marksmanship if Mason was shooting at the intruders, as I am satisfied he was. It is significant that Schnell, who was closer to the back fence than McKellar, was shot before McKellar; the lead target was hit first. Again the testimony is false and the statement true.
Most important, in addition to the obvious fact that Mason's first and second statements were made solely from his own recollection and at a less suspicious time (shorter than two hours after the shooting) than the occasion on which he gave his testimony (six years later), is the fact that all three statements are similar and contrary to his testimony in the most material and crucial point. In none of them did Mason say he intended to fire the shots into the ground. In all of them Mason said he fired three shots at the intruders after they had started to run toward the back fence, away from and not towards the house. The first two statements, especially the written one, are quite clear on this point. The statements and not the testimony are correct as to what actually happened. There can be no doubt that the two boys were trying to escape when they were shot. McKellar was hit in the back by buckshot and Schnell was hit by four No. 6 pellets, one of which lodged on the left side of his left leg between the ankle and the knee, another lodged in the same leg above the knee and towards the back of the leg more than the side, and the other two lodged near the center of the buttocks. As the shots came from the house both boys must have been facing towards the rear fence when they were struck. McKellar could not have been struck in the back and Schnell could not have been struck in the buttocks if either had been facing in the direction from which the shots came.
Nor am I impressed by defense counsels' argument that Mason was in actual danger. In this connection counsel emphasize the fact that the open basement doors were only 18 feet from where Mason saw the intruders. The distance could have been in excess of 30 feet, although this makes no material difference. If, as he would have the court believe, Mason was concerned and in fear as a result of newspaper reports of burglaries and robberies in the neighborhood, I cannot understand why he left the *707 basement doors open. Leaving them open indicates to me a lack of such concern or fear.
A thorough consideration of all of the evidence convinces me that at the time he shot the two boys Mason knew they were going, even running, in the direction away from the house and its basement doors in an effort to escape from the premises.
Defendants do not contend that Mason was justified in shooting the boys simply because they were attempting to steal his pigeons. That has never been the law of Louisiana (see Gardiner v. Thibodeau, 14 La.Ann. 732; McCutcheon v. Angelo, 14 La.Ann. 34; Carmouche v. Bouis, 6 La.Ann. 95; Bibb v. Hebert, 3 La.Ann. 132). They do contend that under all the circumstances involved Mason was placed in reasonable fear for the safety of his wife and himself and therefore had a right to resort to the use of a dangerous weapon.
The rule of law applicable to the instant case was expressed by this court in Patterson v. Kuntz, 28 So.2d 278, 283, as follows:
"Of course, resort to the use of a dangerous weapon in order to repel a supposed attack upon a defendant's person or that of persons to whom he owes a duty to protect cannot be countenanced as justifiable save in exceptional cases where the actor's fear of the danger is not only genuine but is founded on facts which would be likely to produce similar emotions in men of reasonable prudence."
The test used is that of a reasonably prudent man. Where the defendant's action is such as would have been expected from a reasonably prudent person under the same circumstances and where fear of the danger is genuine and founded on facts likely to produce "similar emotions in men of reasonable prudence" no liability results from the use of force which would otherwise be excessive. Edwards v. Great American Insurance Co., La.App., 146 So.2d 260; Wilson v. Dimitri, La.App., 138 So.2d 618; Smith v. Delery, La.App., 98 So.2d 899 and 238 La. 180, 114 So.2d 857; Patterson v. Kuntz, supra.
Particularly apropos is the case of Smith v. Delery, supra, decided by this court and affirmed by the supreme court. That case involved the shooting of a newsboy who had retrieved his dog from bushes in the rear of the defendant's residence and was shot by the defendant. In both appellate courts the most important and material fact determined was whether the boy had turned and was going away from the residence, or had dashed or dived into the shrubbery near the residence, at the time the shot was fired. The rationale of the decision in both courts was that if the boy was going away or retreating from the residence and the defendant as a reasonable person should have realized that fact, the defendant would be liable because he would not have been in such fear for the safety of his family or himself as to justify the use of firearms. At 98 So.2d page 901 of its opinion this court said:
"Since extreme fear of great danger must exist if such a defendant is to escape liability, it would follow that if Delery did not fire until the boy had turned and was actually going away from the residence, the imminent danger no longer existed and there would be liability in Delery."
I am of the opinion that under all the facts and circumstances here involved and known to Mason a reasonable man, including a man of Mason's age and condition as the same are revealed by the record, would not have been in fear for his safety or for the safety of his family. I am also of the opinion that Mason was not actually in such fear and note that the trial court did not find to the contrary.
Mason and his wife were in their residence and that residence was never in danger of being invaded by the intruders who had entered the back yard of the premises and were trying to leave that yard by climbing the back fence. At short distances *708 a shotgun loaded with large buckshot is the most lethal weapon available to any private citizen. Young McKellar will be a paraplegic for the balance of his life. The use of such a weapon in the instant case, and beyond any doubt Mason knew his gun was loaded with buckshot and less lethal loads were available to him, has no justification under our present jurisprudence. If that jurisprudence is to be changed that change should be made by the Supreme Court of Louisiana and not by this court.
I respectfully dissent.
Rehearing denied; SAMUEL, J., is of the opinion that a rehearing should be granted.